[No. 4862–1. Division One. March 27, 1978.]

DONALD C. KNAPPETT, ET AL, *Appellants*, v.
EDWARD M. LOCKE, ET AL, *Respondents*.

*Schweppe, Doolittle, Krug, Tausend & Beezer* and *Alfred J. Schweppe,* for appellants.

*Helsell, Fetterman, Martin, Todd & Hokanson, William A. Helsell, Evans & Quimby, Inc., P.S., Thomas C. Evans,* and *Frank W. Holman, Legal Intern,* for respondents.

WILLIAMS, J.—This action was brought by Donald C. Knappett and wife to enjoin Edward M. Locke, his wife, and Western Home Builders, Inc., from constructing a house of more than two stories, or more than 30 feet in height, upon their lot in the city of Lake Forest Park, in

violation of the ordinances of that city. A temporary injunction halting construction was issued at the instance of the Knappetts. In their answers to the complaint, the Lockes and Western Home Builders denied that the house as planned violated any ordinances of the city, and prayed for damages because of the delay caused by the temporary injunction. After trial, the court entered findings of fact, conclusions of law and judgment dismissing the complaint; after a further hearing, the court entered judgment for the Lockes on the counterclaim for damages. The Knappetts appeal both judgments.

In December 1975, the Lockes engaged Western Home Builders to construct a house for them upon a lot in Lake Forest Park. The "Application and Building Permit," No. 394, specified that the

> Building will be approx. 51 x 41 and three stories high. Basement? Yes___x___ No_____.

When a building permit was issued by the City to Western Home Builders, this action was commenced and a temporary injunction, supported by a $1,000 bond, was issued. A new permit, No. 398, was then issued stating

> Building will be irregular shape, approx. 51 x 41 and two (2) stories high. Basement? Yes___x___ No_____.

The parties entered into a settlement agreement, which led to the dissolution of the temporary injunction by stipulation. The cause of action for a permanent injunction and for damages on the counterclaim were then taken to trial.

Because the Knappetts have abandoned their claim that the house was to be more than 30 feet high, the main question is whether the house, as planned, has three stories, in violation of the city ordinances, or two stories and a basement, in compliance with the ordinances. The answer to this question depends upon the definition of "story," which, in turn, depends upon the definition of "grade."

In 1974, the Lake Forest Park City Council enacted ordinance No. 214,

An ordinance regulating the erection, construction, enlargement, alteration, repair, abatement, demolition, conversion or moving, occupancy and use, height, area, and maintenance of buildings, structures, and land in the City of Lake Forest Park, Washington; providing for the issuance of permits and collection of fees therefor; providing for the adoption of standards of public safety in construction, including a building code, mechanical and fire codes and establishing fire zones; establishing standards of fire prevention, plumbing, waste disposal, electrical, mechanical, health and safety; and providing penalties for violation, and repealing ordinances Nos. 6, 13, 40, 142, and 175.

The ordinance declared that the adoption of certain national "standards," including the Uniform Building Code (U.B.C.), 1973 edition, was necessary to promote the public health, safety, and welfare, and that compliance with the standards was to be prima facie evidence of compliance with the ordinance.

The U.B.C. defines "story" thus:

STORY is that portion of a building included between the upper surface of any floor and the upper surface of the floor next above, except that the topmost story shall be that portion of a building included between the upper surface of the topmost floor and the ceiling or roof above. If the finished floor level directly above a basement, cellar or unused under–floor space is more than 6 feet above *grade as defined herein* for more than 50 percent of the total perimeter or is more than 12 feet above *grade as defined herein* at any point, such basement, cellar or unused under–floor space shall be considered as a story.

(Italics ours.) And "grade" thus:

GRADE (Adjacent Ground Elevation) is the lowest point of elevation of the finished surface of the ground, paving or sidewalk within the area between the building and the property line, or when the property line is more than 5 feet from the building, between the building and a line 5 feet from the building.

A previous city ordinance, No. 204, enacted in 1973, contained no definition of "story," but did contain a definition of "grade":

"Grade" shall mean the average of the finished ground level at the centers of all walls of a building.

First of all, the U.B.C. definition of "grade," and not the definition in ordinance No. 204, must apply. Ordinance No. 214, which is the more recent, states that the definitions in the standards listed therein, which include the U.B.C., shall apply. And because the U.B.C.'s definition of "story" specifically depends on the definition of "grade as defined herein", it would be unreasonable to use a definition of "grade" from a different source.

█ The Knappetts contend that "grade," under the U.B.C. definition, means the lowest point on the building lot within 5 feet of the building. Therefore, they say, if the finished floor level directly above a basement is more than 6 feet above that low point, the basement is a "story" for the purpose of the ordinance prohibiting 3–story houses. We disagree. That interpretation of "grade" would effectively eliminate the phrase "for more than 50 percent of the total perimeter" from the definition of "story"; for if the finished floor level directly above the basement is more than 6 feet above the "grade" (the lowest point to be found on the building lot within 5 feet of the building), then it is more than 6 feet above it *for 100 percent of the perimeter.* If the Knappetts are correct, the "12 feet above grade" phrase would also be meaningless.

To further appreciate the impracticability of the Knappetts' theory, one need only imagine a house which on three sides looks like an ordinary 2–story house with an underground basement, but which has a fourth side with a door to the basement and a flight of steps rising to the level of the ground surrounding the house. This house would have "3 stories" because there would be a point immediately outside the basement door, which would be the lowest point on the building lot within 5 feet of the building; that point, by the Knappetts' definition, would be the "grade" for all purposes.

There is a more realistic reading of "grade": each point along the outside of a building has its own "grade," which is

the lowest point of elevation, along a line running perpendicular to the side of the building, on the building lot within 5 feet of the building. Just as there is an infinite number of points on the outside of a building, so is there an infinite number of "grades," one for each point on the building. To determine whether a basement is a "story," one measures the distance between the finished floor level directly above the basement and the "grade" *that corresponds to that particular point on the outside of the building.* Then one moves to another point along the outside of the building, and measures the distance, *at that point,* between the finished floor level and the "grade" that corresponds to *that* particular point on the outside of the building. After this is done around the total perimeter of the house, it can be determined whether the floor level directly above the basement is more than 6 feet above grade *for more than 50 percent of the building's perimeter.* The only question is how often, along the perimeter of the building, such measurements must be made to insure an accurate determination of "grade."

The Lockes argue, and the trial court apparently agreed, that the measurements could be made by either of two "wall–by–wall" methods, each of which would result in the Lockes' basement *not* being a "story." The first method is to take the measurement at the middle of each wall; the second is to find the lowest point within 5 feet of any point on the wall. Either way, one measurement is used for the entire length of that particular wall. The record indicates that Mr. Howard Nordlund, the city building inspector, took a measurement at approximately the center of each wall; Nordlund's computations, which the Knappetts do not dispute, show that the first floor level is less than 6 feet above "grade" for 72 percent of the perimeter of the house. Of the two methods, the center–of–the–wall method is more likely to produce an accurate result and should usually be used.

However, where the ground level adjacent to the house is markedly uneven, measurements, in order to be accurate,

may have to be taken more often than once per wall, so that the floor level directly above a "story" will, indeed, be 6 feet or more above the ground for more than 50 percent of the building's perimeter, or 12 feet or more above the ground at any point. For example, where the distance from the floor level directly above the basement to the "grade" is less than 6 feet at the middle of the wall, but more than 6 feet almost everywhere else along the wall, it would not make sense to measure only at the middle of the wall and then declare that for purposes of the 50–percent–of–the–perimeter requirement, the distance between grade and floor level is less than 6 feet for the entire length of the wall. After examining the vertical profile of the ground surrounding the house, a civil engineer should have no difficulty in determining how many points should be used.

The only other question is whether the court erred in awarding $1,000 damages to the Lockes on their counterclaim. The Knappetts, who were required by the court, pursuant to RCW 7.40.080 and CR 65(c), to post a $1,000 bond in order to obtain the February 5 temporary injunction, argue that the injunction was rightfully issued because the first building permit, on its face, was for a 3–story house. True, it was, but the test is not whether the injunction was erroneous on its face, but whether it is later determined that the restraint was erroneous in the sense that it would not have been ordered had the court been presented all of the facts. *Swiss Baco Skyline Logging Co. v. Haliewicz,* 14 Wn. App. 343, 541 P.2d 1014 (1975). When all of the facts were made known at the trial, the first permit, purporting to describe a 3–story house *plus a basement,* was obviously the result of a clerical error, and the trial court so found. The judgment in favor of the Lockes constitutes a finding that they were "wrongfully enjoined or restrained." CR 65(c).

Judgment affirmed.

FARRIS, C.J., and DORE, J., concur.

Reconsideration denied August 22, 1978.

Review granted by Supreme Court December 14, 1978.