[No. 6753-1. Division One. November 5, 1979.]

WHARF RESTAURANT, INC., *Appellant,* v. THE PORT OF SEATTLE, *Respondent.*

602

*Shidler, McBroom, Gates & Baldwin, James R. Irwin,* and *David H. Binney,* for appellant.

*Schweppe, Doolittle, Krug, Tausend & Beezer, Fredric C. Tausend, James B. Street, Bogle & Gates,* and *Dale B. Ramerman,* for respondent.

ANDERSEN, J.—

FACTS OF CASE

In August of 1976, Wharf Restaurant, Inc. (Wharf) received a $1,300,000 offer to purchase the Wharf Restaurant which it operated on premises leased from the Port of Seattle (Port) at Fishermen's Terminal in Seattle. It was only a few months later that the Wharf neglected to timely exercise the option to renew its lease. When the Port leased the premises to another operator, The Wharfside Companies, this litigation ensued.

The Wharf entered into its original lease with the Port in 1951 and commenced its restaurant business at Fishermen's Terminal in 1952. The original lease was for a 10–year term with an option to renew for an additional 10 years on the giving of 6 months' prior written notice to the Port. Over the years, the provisions of the lease as to length of lease term, rental rates and options to renew were several times amended by agreement of the parties.

The last option contained in the lease, the one at issue, was an option whereby the Wharf could renew its lease for a 5–year term beginning June 1, 1977. The lease provided that the option was to be exercised by the Wharf by giving notice in writing to the Port between 180 and 150 days prior to May 31, 1977 when its then current lease term would otherwise expire. The deadline for exercising the final 5–year option in the lease was thus January 3, 1977.

Wharf's president and others connected with its restaurant business, whose obligation it was to exercise the option if a renewal of the lease was desired, simply forgot to do so. The Port's real estate department apparently did not notice the lapse either until a month and one–half after the option

deadline had passed. Shortly thereafter, on February 28, 1977, the Port sent a letter to the Wharf advising of the Wharf's failure to exercise the option and informing the Wharf of the Port's intention to solicit other proposals for the premises and requesting the Wharf's cooperation in permitting other people to look at the premises.

After receiving the Port's letter, Wharf's president went to the Port's real estate department on March 4, 1977 and sought to remedy his oversight. He was told that office could do nothing, but that he could request the Port Commission itself to take up the matter. This he did and the matter then became the subject of considerable discussion at port commission hearings. The sum of the efforts to amicably work out new arrangements between the Wharf and the Port was that for one reason or another, no mutually satisfactory solution could be agreed upon and the Port entered into a 20–year lease with The Wharfside Companies.[1]

The Wharf then commenced this action against the Port and its new lessee.

The Wharf has not been ejected from the premises and has continued to operate its restaurant business there. First, this was by virtue of a temporary agreement worked out with the Port, and later, it was by reason of injunctions issued by the trial court.

Following a 2 1/2 week trial to the court, the trial court resolved the dispute by entering its judgment and decree as follows: The Wharf was granted specific performance of its option right to a new 5–year lease term through May 31,

---

[1]The Port's new lessee of the Wharf Restaurant premises was The Wharfside Companies, a Washington corporation. It and a related company, Artisan's Guild, Inc., were defendants in this case at trial but are not parties to this appeal. When the Port sent out invitations to others to submit bids or proposals for a long–term lease, some 12 or more parties responded including the Wharf and The Wharfside Companies. In the evaluation of the various proposals by the Port staff, the Wharf ranked fourth and The Wharfside Companies ranked first. It was then that the Port Commission voted to accept the proposal of The Wharfside Companies.

1982;[2] the Wharf's various other claims were denied, including its claimed right to a first refusal on the new 20–year lease given by the Port to The Wharfside Companies; the various other claims, counterclaims and cross claims by and among the Wharf, the Port and The Wharfside Companies were denied; the Port's new lease to The Wharfside Companies was declared null and void; and aside from the injunction bond premium paid by the Wharf, and other costs connected therewith, which the Port was ordered to repay, the parties would bear their own costs and attorneys' fees.

Additional facts will be noted in connection with our discussion of the issues to which such facts specifically relate.

The Wharf brings this appeal claiming that the trial court erred when it did not decree that the Wharf was entitled to a new 20–year or other long–term lease. The Port cross–appeals claiming that the trial court erred when it decreed specific performance of the Wharf's option to extend its old lease for 5 years.

The parties' assignments of error present two principal issues.

## ISSUES

ISSUE ONE. Did the trial court err in refusing to decree specific performance of what the Wharf claimed was a promise by the Port to give the Wharf the right of first refusal on the later 20–year lease to the Wharf Restaurant premises, or to award damages in connection therewith?

ISSUE TWO. Did the trial court err in relieving the Wharf of the consequences of the Wharf's delay in giving the notice, specified in its lease with the Port, that it was exercising its option to renew for another 5–year term?

---

[2]A separate trial was later held to determine the amount of rental to be paid by the Wharf to the Port. A judgment setting rental was entered therein setting the rent on the Wharf's 5–year lease for the period June 1, 1977 through May 1 [*sic* May 31], 1982 at 7 percent of gross sales, or a minimum rent of $8,500 per month, whichever is greater. That judgment is the subject of a separate appeal by the Port in Court of Appeals cause No. 7510–1–I.

DECISION

ISSUE ONE.

CONCLUSION. Any claimed promise by the Port to the Wharf of a right of first refusal on the 20–year lease later entered into between the Port and the new lessee was illusory, and specific performance and damages were properly denied.

Following discovery of the Wharf's failure to timely exercise the option to renew its lease, the matter was considered at some length by the Port Commission and by the Port's real estate department. The Wharf's claim for a 20–year lease or other long–term lease is based on those events.

A wide–ranging discussion concerning the future of the Wharf Restaurant premises took place at the Port Commission's meeting of March 22, 1977. During that discussion, Commissioner Kotkins observed that the Port should not ignore the Wharf's 25 years as a tenant of the Port and mentioned giving it "first refusal so to speak, at the going rate." Finding of fact No. 25.

Commissioner Kotkins' proposed resolution, however, according to the approved minutes of the meeting, only instructed the Port staff to "solicit proposals for a new lease agreement from [the Wharf] and others who may be interested if it would be helpful, and evaluate the proposals after receipt to determine the proposal most advantageous to the Port." A verbatim transcript of the taped record of the meeting, however, recorded the words of Commissioner Kotkins' resolution somewhat differently:

> I move that we refuse to reinstate the original lease and we instruct the Real Estate Department to negotiate with [the Wharf] for a prevailing type of lease and do whatever is necessary to determine what that is. If they fail to do that, then they should advertise in a formal way for . . .

According to the typed transcript of the recorded proceedings, the commissioner in stating his resolution stopped in mid–sentence. In any event, the resolution did pass. Finding of fact No. 25.

The trial court found as a fact that the Port had not promised the Wharf a right of first refusal, that is, a right to match the best lease offer that the Port could secure from anyone else, but that the Port had promised to negotiate with the Wharf for "a prevailing type of lease." Findings of fact Nos. 26–28. The trial court found and concluded that "[t]he promise made by the Port through the Kotkins resolution was not a promise of a right of first refusal. It was a promise to negotiate." Conclusion of law No. 8. The trial court also found that there was a misunderstanding between the Wharf and the Port as to their understanding of the word "negotiate," with the result being that the Port by refusing to make counter offers to the Wharf's offers had refused to negotiate.[3] Findings of fact Nos. 28–31; conclusion of law No. 12.

The trial court then concluded as to the 20–year or other long–term lease claimed by the Wharf, that the Port's promise to negotiate was an illusory promise and not enforceable and, further, that the Wharf's claim for a right of first refusal to the 20–year lease, or in the alternative for a right to further negotiate, could not be sustained. Conclusions of law Nos. 13, 14.

In this connection, the Wharf argues in its brief filed in this court that "[t]he promise, when taken in context with what was said at the March 22, 1977 meeting of the Port Commission, was a promise for a right of first refusal, or at the very least, to enter into a prevailing type of lease with the Wharf at prevailing rental rates." It further argues that the promise to negotiate as found by the trial court was not illusory, and that a careful reading of the trial court's findings of fact and conclusions of law establish all of the elements of promissory estoppel entitling the Wharf to either specific performance of a 20–year or other long–term lease

---

[3]The Port contends that the trial court erred when it misconstrued the meaning of the word "negotiate" to require counter offers. In view of the basis on which we resolve Issue One, it is unnecessary to address that aspect of the Port's argument.

from the Port or the right to recover damages from the Port for its refusal to negotiate.

We have carefully reviewed the minutes of the Port Commission's March 22, 1977 meeting and the transcript of the taped record of that meeting. The differences in the two versions is not material enough to affect our analysis of the legal effect of Commissioner Kotkins' resolution. Since our decision is the same with reference to whichever version is used, we therefore do not address the issue raised by the parties as to which version is controlling.

We agree with the trial court that there is nothing in the Kotkins' resolution which, in context, could reasonably be construed as an action by the Port Commission giving the Wharf a right of first refusal of the 20-year lease which the Port later entered into with The Wharfside Companies.

■ What the Wharf's president, who was present at the meeting, may have subjectively understood the resolution to mean is not determinative. Under the objective manifestation theory followed by the courts of this state, the right of the Wharf's president to rely on the Port Commission's resolution must be interpreted in light of what "a reasonable person in the position of the parties would have thought it meant." 1 S. Williston, *A Treatise on the Law of Contracts* § 94 (3d ed. 1957). *Accord, Plumbing Shop, Inc. v. Pitts*, 67 Wn.2d 514, 517, 408 P.2d 382 (1965); *Alexander & Alexander, Inc. v. Wohlman*, 19 Wn. App. 670, 681, 578 P.2d 530 (1978).

No reasonable person could have considered the resolution adopted by the Port as a promise on which the Wharf could justifiably rely so as to now invoke the doctrine of promissory estoppel.[4] *Corbin v. J.I. Case Co.*, 70 Wn.2d 522, 538-39, 424 P.2d 290 (1967); *Gorge Lumber Co. v.*

---

[4]The Wharf's brief of appellant at pages 14, 17 and 18 characterizes the trial court as having found that it was reasonable for the Wharf's president to have understood the motion as giving the Wharf a right of first refusal. Our review of the record, however, establishes to the contrary. The trial court expressly refused to so find and struck out a finding of fact proposed by the Wharf that "[a] reasonable man would have understood the promise to be a right of first refusal."

*Brazier Lumber Co.,* 6 Wn. App. 327, 336, 493 P.2d 782 (1972).

 So far as the claimed promise of the Port to negotiate as found in the language of the Port Commission's resolution is concerned, the trial court correctly concluded that it was illusory and therefore unenforceable. A supposed promise is illusory when it is so indefinite that it cannot be enforced, or where, as here, its provisions are such as to make its performance optional or entirely discretionary on the part of the claimed promissor. *Spooner v. Reserve Life Ins. Co.,* 47 Wn.2d 454, 458, 287 P.2d 735 (1955); *Sandeman v. Sayres,* 50 Wn.2d 539, 541, 314 P.2d 428 (1957). An agreement to negotiate a contract in the future is nothing more than negotiations. *Johnson v. Star Iron & Steel Co.,* 9 Wn. App. 202, 206, 511 P.2d 1370 (1973). It may be further observed that it is very questionable whether the resolution even constitutes a promise at all, since it appears to be no more than an instruction by the Port Commission to its staff, and which would require the staff to act in some affirmative fashion before enforceable rights could be created in a third party such as the Wharf. 1 A. Corbin, *Corbin on Contracts* § 27 (1963).

ISSUE TWO.

CONCLUSION. Under the special circumstances which the trial court found to exist in this case, that court as a court of equity was empowered to grant the relief it did against the consequences of the Wharf's failure to timely exercise its option to renew its old lease with the Port for a 5–year term. The trial court did not err in decreeing specific performance of the old lease for the 5–year term.

██ There was no waiver of notice by the Port. Whether or not there is a waiver of timely notice of exercising an option is a question of fact to be determined from the circumstances indicating the intention of the parties. 50 Am. Jur. 2d *Landlord and Tenant* § 1186, at 74 (1970). *See Achtar v. Posner,* 189 Md. 559, 56 A.2d 797, 799 (1948); *Giardina v. Farms Co.,* 25 Md. App. 201, 333 A.2d 366, 370–71 (1975). Here the trial court expressly found there

was no waiver by the Port, and also, that in failing to give notice the Wharf had not relied on the Port's prior conduct. It therefore concluded that the Port was not estopped to insist on timely written notice.

The trial court then went on, however, to conclude that based on equitable principles the Wharf was entitled to a decree establishing its right to exercise the 5–year renewal option in its old lease with the Port. Thus, the issue directly before us is the effect of a lessee's failure or delay in giving notice, in the manner and time specified, of the lessee's intention to exercise a renewal option given in a lease.

█ The general rule is that a notice of election to renew a lease conformable to an option therein contained must be definite, unequivocal, unqualified and given strictly in accordance with the terms of the lease. *Jones v. Dexter*, 48 Wn.2d 224, 292 P.2d 369, 51 A.L.R.2d 1399 (1956); 44 A.L.R.2d 1359, 1362 (1955).

In accordance with this principle, it is generally recognized that where a lessee has a right of renewal provided it gives the lessor notice by a specified time that it intends to exercise such privilege, the giving of the notice is a condition precedent with which the lessee must comply within the stipulated time and, in the absence of special circumstances warranting a court of equity giving relief by granting the right of renewal, is lost if the notice is not given in accordance with the provisions of the lease. 44 A.L.R.2d 1359, 1362 (1955); *Carsten v. Eickhoff*, 163 Ind. App. 294, 323 N.E.2d 664, 667–68 (1975).

The courts which have considered this problem have not found the solution simple. On the one hand is equity's abhorrence of a forfeiture. On the other hand is the general reluctance of courts to relieve a party from its own negligent failure to timely exercise an option, when to do so might tend to introduce instability into business transactions and disregard commercial realities.

█ A majority of the courts which have dealt with this issue in recent years have concluded, however, that there

can be special circumstances which may warrant a court in granting equitable relief against a lessee's failure or delay in giving notice to renew an option in its lease. *See* 50 Am. Jur. 2d *Landlord and Tenant* § 1187 (1970); 44 A.L.R.2d 1359 (1955); 1 W. Jaeger, *Williston on Contracts* § 76 n.4, at 248–49 (3d ed. 1957); 1 A. Corbin, *Corbin on Contracts* § 35, at 146–47 (1963); 51C C.J.S. *Landlord and Tenant* § 59 (1968). We agree, but conclude that the circumstances in which equitable relief can be granted are very limited.

Professor Corbin in his treatise on the law of contracts in our opinion best expresses this rule and its limitations:

There is one sort of case in which it has been held that the power of acceptance continues to exist for a short time after the expiration of a time limit expressly set by the offeror and known to the offeree. The only cases known to the writer, in which it has been so held, were cases of option contracts creating an irrevocable power, and in which the holder of the option neglected to give notice of acceptance within the time fixed although he had made valuable permanent improvements with intention to give the notice.

Thus, it was held that the power of the holder of an option to buy or renew, contained in a lease, is not necessarily terminated by failure to give notice within the specified time. If, in expectation of exercising the power, the lessee has made valuable improvements, and the delay is short without any change of position by the lessor, the lessee will be given specific performance of the contract to sell or to renew. This is for the purpose of avoiding an inequitable forfeiture. Where no inequitable forfeiture will occur, the same rule is applicable to an option contract as to a revocable offer; a time limit, expressly stated, is controlling. The mere fact that a price was paid for the option does not result in forfeiture. If one pays five hundred dollars for a thirty day option to buy land for twenty thousand dollars, the power to accept for thirty days is the exact agreed equivalent of five hundred dollars. An extension of the power, even for a moment of time, by action of a court, is compelling the offeror to give something for nothing.

(Footnotes omitted.) 1 A. Corbin, *Corbin on Contracts* § 35, at 146–47 (1963). *See also Twyford v. Whitchurch,* 132

F.2d 819, 822 (10th Cir. 1942); *Gloyd v. Midwest Refining Co.,* 62 F.2d 483, 486–87 (10th Cir. 1933). The Washington decisions of *Jones v. Dexter, supra* and *Gray v. Lipscomb,* 48 Wn.2d 624, 296 P.2d 308 (1956), argued by the Port are distinguishable. In *Jones v. Dexter, supra* at 229, the court specifically observed that "there are no equities in favor of the [lessee]"; and in *Gray v. Lipscomb, supra,* nothing in the opinion indicates either that the facts of the case brought it within the above principle or that this principle was ever argued or considered.

The following "special circumstances" existing in this case, taken together, justify the trial court's decision to grant specific performance of the old lease between the Port and the Wharf for an additional 5–year term despite the Wharf's late notice.

1. The failure to give notice was purely inadvertent. Finding of fact No. 14. It was not the result of intentional, culpable or, as some courts refer to it, "grossly negligent" conduct.

2. An inequitable forfeiture would have resulted had equity not intervened. Although the findings of fact are not as enlightening on the matter as they could have been, a reading of the trial court's findings of fact and conclusions of law in context with the trial record convinces us that the trial court was satisfied that permanent improvements had been made on the premises by the lessee with the intention of exercising its option and remaining on the premises. *See particularly* finding of fact No. 45. In fact, on the last day of the period within which the Wharf was to give notice of renewal, the Wharf's president met with the Port staff and discussed making yet additional improvements to the premises. Finding of fact No. 14.

3. As a result of the Wharf's failure to give timely notice, the Port did not change its position in any way and was not prejudiced thereby. The trial court found and concluded that the Port had showed no prejudice and that when the Port learned the Wharf wanted to extend its lease, there were still almost 3 months remaining of the then current

lease term, leaving ample time to renegotiate the rent, and if negotiations failed, to put the matter of rent before the Port Commission for decision as the lease contemplated. Finding of fact No. 21; conclusion of law No. 18.

4. The lease was for a long term, not a short term. The lessee also had continuously leased the premises for the preceding 25 years and had paid the Port over $1 million in rent.

5. There was no undue delay in the giving of notice by the Wharf. Ordinarily, the 2–month delay in exercising the option which occurred here would be considered so excessive as to not justify the intervention of equity, but it was not in this case because the conduct of the Port staff substantially contributed to cause the delay. Throughout the 25–year history of the lease, the parties at no time followed the prescribed methods of exercising the lease option or readjusting rentals and the Port had previously accepted even later exercises of lease options than this one without comment. Then subsequent to the beginning of the then current lease term during which the Wharf was supposed to exercise its option, the Port had appointed a new director of its real estate department. As the trial court found, "after [the new director] took over as director of real estate, the Port changed its policy to require strict compliance with notice requirements in tenants' leases. However, this change in policy was unilateral and without notice to the Wharf." Finding of fact No. 13.

The trial court did not err in decreeing the specific performance it did.

The remaining assignments of error by the parties are not well taken.

Some assignments have not been argued in the briefs and are therefore deemed waived. Our decision on the principal issues on the bases stated has made it unnecessary to address others.

The trial court did not err when it concluded that the Wharf failed to establish its fraud claim. Conclusion of law No. 2. As the trial court found, there was no bad faith,

intentional misconduct or breach of duty by the Port. Finding of fact No. 41.

The Wharf's claim that the trial court erred in failing to award it actual attorneys' fees and costs is also not well taken. The Wharf has cited no statute or provision of the lease which gives it any right in this regard. The Wharf does, however, cite our decision in *Manning v. Loidhamer,* 13 Wn. App. 766, 538 P.2d 136 (1975) in support of its argument that it is entitled to attorneys' fees and actual costs because it was the Port's refusal to negotiate with it or to renew the Wharf's old lease that caused the Wharf to become embroiled in litigation with The Wharfside Companies. In *Wilber v. Western Properties,* 22 Wn. App. 458, 467, 589 P.2d 1273 (1979), we held: "[a]s we made clear in *Manning v. Loidhamer, supra,* in order to recover attorneys' fees and . . . costs, the suit generating them must be instituted by a third party unconnected with the transaction." That was not the situation here. It was the Wharf itself, and not a third party, that instituted the present action. The Wharf is not entitled to recover actual costs and attorneys' fees.

■ Both the Wharf and the Port assign error to a number of the trial court's findings of fact. Since there is substantial evidence supporting the questioned findings, we will not interfere with them. *Thorndike v. Hesperian Orchards, Inc.,* 54 Wn.2d 570, 575, 343 P.2d 183 (1959).

Neither did the trial court err when it provided in the judgment, which also dissolved the injunction, that the injunction bond premium and related costs paid by the Wharf should be reimbursed to it by the Port. CR 65(c). *See Knappett v. Locke,* 19 Wn. App. 586, 592, 576 P.2d 1327 (1978), *aff'd,* 92 Wn.2d 643, 600 P.2d 1257 (1979).

Affirmed.

James and Ringold, JJ., concur.