**Joseph Lee LOGAN, Jr. and Pattey Surrency Daniel, Plaintiffs,**

**v.**

**CORINTH–ALCORN COUNTY JOINT AIRPORT BOARD; Jessie L. Vanderford, Individually and as Chairman of Said Board; Harold Patrick, Individually and as a Member of Said Board; Clarence Paul, Individually and as a Member of Said Board; and William Odom, Individually and as a Member of Said Board, Defendants.**

No. EC85–262–LS–D.

United States District Court, N.D. Mississippi, E.D.

July 23, 1987.

John Booth Farese, Farese, Farese & Farese, P.A., Ashland, Miss., for plaintiff Joseph Lee Logan, Jr.

Donald D. Wrighton, Aberdeen, Miss., for plaintiff Pattey Surrency Daniel.

Robert G. Krohn, Price, Krohn & McLemore, Corinth, Miss., for defendants.

## OPINION GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

SENTER, Chief Judge.

This cause comes before the court on defendants' motions for summary judgment (1) as to all defendants on the grounds that there was no breach of the underlying contract, (2) as to all individual defendants on the ground of personal immunity of board members for actions taken in their governmental capacity, (3) as to William C. Odom, Jr., because he voted against the proposed termination, and (4) as to Clarence Paul because he was not a member of the board at the time the board voted to terminate the contract. The court finds that the motions enumerated (1) and (2) above are well taken and for reasons set out below are accordingly granted. The motions enumerated (3) and (4) were not considered, as the granting of motion (2) renders both motions moot.

*Facts.*

On January 29, 1984, plaintiff Joseph Lee Logan, Jr., and defendant Corinth-Alcorn County Joint Airport Board entered into an agreement where Logan would serve as fixed base operator for the Corinth-Alcorn County Airport in return for which Logan would receive use of the terminal building and other facilities. The agreement provided for a one-year term ending on February 28, 1985,

except that the term hereof shall automatically extend for an additional two (2) year period unless one of the parties shall give written notice to the other party not later than sixty (60) days prior to the expiration of the first year of that party's intention to terminate this lease

agreement at the end of the first year. At the end of the initial three (3) year period, the lessee shall have the option to renew this lease for an additional period of three (3) years on the same terms and conditions herein expressed by giving notice in writing to lessor of lessee's election to extend this lease not later than sixty (60) days before the expiration of the original or primary lease period.

In March, 1984, Logan began operations at the Corinth-Alcorn County Airport under the name Corinth Aviation. (Corinth Aviation will be used to refer to Logan's business operations.) On October 9, 1984, there was a meeting of the board, attended by Joe Logan, in which the board approved a motion "that this Board advise Mr. Joe Logan that it does not intend to renew the Lease Agreement." The motion was approved three to one with William C. Odom, Jr., voting against the motion. The board then unanimously approved two motions hiring an attorney to develop a new lease and authorizing new negotiations with Joe Logan in connection with the new lease. In November, 1984, a copy of the minutes of the October 9, 1984, meeting was provided to Joe Logan.

In early December, 1984, Joe Logan left Corinth to visit relatives in Georgia and Florida. On December 13, 1984, the board sent a certified letter to Logan at the business's address. This letter expressly terminated the lease on February 28, 1985. The post office gave notice of the letter on December 15 and December 20, 1984. The letter was never claimed by Logan or his employees. Hand delivery of a second letter with similar language to Nell Brown, a full-time employee of Logan's, was attempted on December 21, 1984. Nell Brown's duties included securing Corinth Aviation's mail from the mailbox, delivering mail to the post office, and opening bills received in the mail.[1] Nell Brown

---

1. Logan disputes in his response to the motion for summary judgment that Brown's duties included receiving and sending mail. The defendants pulled their description of Brown's duties from Logan's own sworn deposition. This court must examine the alleged facts in a light most

favorable to the nonmoving party in a motion for summary judgment, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). But this does not mean that the plaintiff can effectively contradict his

refused to accept the letter, and the envelope was left on her desk. Logan telephoned the offices of Corinth Aviation on or about December 21 and was informed of the attempt to deliver the letter and of the presence of the letter in the office. He did not instruct Nell Brown to open the letter and read him the contents. The letter was not opened until January 2, 1985, when Logan returned. This cause was filed June 19, 1985, alleging breach of contract by the board and its officers and tortious interference with the contract by the officers of the board.

*Conclusions of Law.*

(1) The Minutes of October 9, 1984, Authorize the Termination of the Lease.

■ The minutes of October 9, 1984, contain the approved motion "that this Board advise Mr. Joe Logan that it does not intend to renew the lease agreement." The lease agreement states that "the term hereof shall automatically extend for an additional two (2) year period unless *one of the parties* shall give written notice to the *other party* not later than 60 days prior to the expiration of the first year of that party's intention to *terminate* this lease agreement at the end of the first year." (Emphasis added.) The lease agreement continues to grant an option to the lessee to *renew* at the end of the initial three-year term. The plaintiffs contend that the statement "does not intend to renew" is insufficient to authorize termination of a lease.

The board had a right under the contract to terminate at the end of the first year—a right clearly delineated by the phrases "one of the parties" and "other party" as opposed to the explicit reference to "lessee" in the following sentence. The board had the power to lease on its own terms, limited by a restriction of the maximum term to forty years. *See* Mississippi Code Annotated § 61–5–11 (1972). Any additional restriction imposed on federal funds used by the board would also limit this power. *See* Mississippi Code Annotated § 61–5–15 (1972).

That the board had the right to terminate under the lease and the power to do so own sworn testimony with an unsworn memo-

under Mississippi Code Annotated § 61–5–37 (1972) means that termination was proper if the language in the minutes authorized it. "Strictness in verbiage is not required in the minutes of a board of supervisors, ... [i]t is not a tribunal of legal experts but of laymen, and all that is required is substance and good sense in the terms used, under a reasonable and fair construction of its provisions." *Smith v. Ballard,* 241 Miss. 194, 129 So.2d 635 (1961). *See Paine v. Underwood,* 203 So.2d 593 (Miss.1967); *People's Bank of Weir v. Attala County,* 156 Miss. 560, 126 So. 192 (1930). Where (as here) the contract the board considered used the words extension and renewal interchangeably to refer to additional terms under the lease, it is clear that the use of the words "not renew" by laymen coupled with active attempts to terminate by the very men who voted for the motion must authorize termination of the lease.

Nor does the mention in the minutes of negotiations with Joe Logan to form a new lease predicate the ability of the board to terminate on the presence of such negotiations. A statement that the parties will negotiate is a mere "contract to make a contract" which, failing to state all the essential terms, is considered to be no contract at all. *See generally* 1 *Corbin On Contracts* § 29 (1963). A promise to negotiate is an illusory promise which binds the promisor to nothing but to discuss the possibility of a future promise. "Illusory promises" do not form valid contracts in Mississippi. *See Krebs by and Through Krebs v. Strange,* 419 So.2d 178 (Miss. 1982). The mere fact that the illusory promise is recorded in the minutes of a governmental agency renders it no less illusory. *Cf. Wharf Restaurant, Inc. v. Port of Seattle,* 24 Wash.App. 601, 605 P.2d 334 (1979). The board authorized termination of the lease by its vote of October 9, 1984.

(2) The Individual Defendants are Immune From Liability With Regard to the Lease Termination.

■ The decision to grant, or to terminate, the lease on the airport facilities was randum.

a decision which could only be made by the board as a whole. The powers of the board were defined by its charter as "full and complete power to plan, acquire, establish, develop, construct, enlarge, improve, maintain, operate, regulate and police any airport ... to be jointly acquired, controlled, and operated...." Charter Section III (1). This included the power to "enter into any contracts necessary to the execution of the powers granted it." Charter Section VIII. Mississippi has long held that public officials are immune from personal liability for actions taken as a public body. *Davis v. Little*, 362 So.2d 642 (Miss.1978); *Wray v. McMahon*, 182 Miss. 592, 182 So. 99 (1938). This view has continued as to individuals who perform discretionary acts in their official capacity even though the Mississippi Supreme Court has abolished sovereign immunity as to the state itself. *Pruett v. City of Rosedale*, 421 So.2d 1046 (Miss. 1982). *See also White v. City of Tupelo*, 462 So.2d 707 (Miss.1985); *Hudson v. Rausa*, 462 So.2d 689 (Miss.1984).

The plaintiffs contend that the individual defendants cannot be immune because there was a bad faith motive behind the board's actions. The plaintiffs cite *Holladay v. Roberts*, 425 F.Supp. 61 (N.D.Miss. 1977), for the proposition that defendants must possess both a subjective belief that the action was proper and that the action must have been "reasonable in light of established constitutional principles." *Holladay* was a case under 42 U.S.C. § 1983 and is not applicable to the present case. Further, in *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), the Supreme Court specifically eliminated the subjective portion of the inquiry into immunity under § 1983. Thus, the inquiry into motive would be irrelevant even if this action had been brought under § 1983. The plaintiff has cited no Mississippi cases concerning motive behind the actions of a governmental entity. Those cases which Logan has cited concern individual tortious conduct in personal injury cases and not the decisions of governmental boards. As the plaintiff has alleged no facts showing the existence of a conflict of interest on the part of members of the board, summary judgment will be granted to the individual defendants on the grounds that they are immune from suit.

(3) Whether Notice Was Properly Served on Joseph Lee Logan, Jr.

■ The record shows three attempts to serve written notice on Joseph Lee Logan, Jr. A copy of the minutes of the meeting where the termination vote occurred was presented to him in late October or early November, 1984. A letter dated December 7, 1984, was mailed to Logan on December 13, 1984, and receipt was apparently refused on December 15 and December 20, 1984. A second letter, dated December 14, 1984, was hand delivered to Corinth Aviation on December 21, 1984. The defendants argue that each of these attempts constituted adequate notice under the contract. The defendants base this assertion on Mississippi Code Annotated §§ 75–1–201(26), 75–1–201(38) (1972), stating that the agreement is more properly termed a commercial transaction than a lease. The plaintiffs contend that the agreement is a lease properly governed by Mississippi Code Annotated § 89–7–23 (1972), and that the question of notice is properly a jury question under *McCreary v. Stevens*, 156 Miss. 330, 126 So. 4 (1930).

The contract in question requires that the terminating party "give written notice", but offers no guidance as to what constitutes written notice nor what constitutes giving such notice. The contract can either be described as a lease of real property or a contract for services. Neither of these types of contract is explicitly covered by the Uniform Commercial Code which governs only the eight enumerated subjects of sale of goods (§§ 75–2–101, et seq.), commercial transactions (bills and notes) (§§ 75–3–101, et seq.); bank deposits and collections (§§ 75–4–101, et seq.); letters of credit (§§ 75–5–101, et seq.); bulk transfers (§§ 75–6–101, et seq.); documents of title (§§ 75–7–101, et seq.); investment securities (§§ 75–8–101, et seq.); and secured transactions (§§ 75–9–101, et seq.). However, many states have applied the general provisions of U.C.C. Article 1 by analogy in such circumstances, and the Code must be

considered persuasive authority in such matters. *See Anderson's Uniform Commercial Code* §§ 1–101:18, 1–101:19 (1986).

The plaintiff contends the lease is governed by Mississippi Code Annotated § 89–7–23 (1972). This section requires notice to vacate "only where the term is not to expire at a fixed time." The section has been applied only where the lease was entirely indefinite; *see Hamilton v. Federal Land Bank*, 175 Miss. 462, 167 So. 642 (1936); *Richardson v. Neblett*, 122 Miss. 723, 84 So. 695 (1920); *Wilson v. Wood*, 84 Miss. 728, 36 So. 609 (1907); or where an oral lease for a fixed term was invalidated under the statute of frauds, *Scruggs v. McGehee*, 110 Miss. 10, 69 So. 1003 (1915). In the cause *sub judice*, the lease provides for three possible terms, but each of those terms has a fixed and definite ending date. The statute does not, therefore, seem to apply. Even were the court to apply this statute, none of the cases which have considered this statute have defined the term "give notice."

The plaintiff's contention that the determination of receipt of notice is a jury question under *McCreary v. Stevens*, 156 Miss. 330, 126 So. 4 (1930), is inapposite. *McCreary* dealt with notice in the context of a negotiable instrument. The reasoning of this case has been effectively rejected by the legislature due to Mississippi's adoption of UCC § 1–201. Therefore, in the absence of binding authority to the contrary, the provisions of § 75–1–201 (26), (27), and (38) (1972) should be applied by analogy as these are the legislature's most recent pronouncements on commercially reasonable notice. Those sections provide:

(26) A person "notifies" or "gives" a notice or notification to another by taking such steps as may be reasonably required to inform the other in ordinary course whether or not such other actually comes to know of it. A person "receives" a notice or notification when

(a) it comes to his attention; or

(b) it is duly delivered at the place of business through which the contract was made or at any other place held out by him as the place for receipt of such communications.

(27) Notice, knowledge or a notice or notification received by an organization is effective for a particular transaction from the time when it is brought to the attention of the individual conducting that transaction, and in any event from the time when it would have been brought to his attention if the organization had exercised due diligence. An organization exercises due diligence if it maintains reasonable routines for communicating significant information to the person conducting the transaction and there is reasonable compliance with the routines. Due diligence does not require an individual acting for the organization to communicate information unless such communication is part of his regular duties or unless he has reason to know of the transaction and that the transaction would be materially affected by the information.

(38) "Send" in connection with any writing or notice means to deposit in the mail or deliver for transmission by any other usual means of communication with postage or cost of transmission provided for and properly addressed and in the case of an instrument to an address specified thereon or otherwise agreed, or if there be none to any address reasonable under the circumstances. The receipt of any writing or notice within the time at which it would have arrived if properly sent has the effect of a proper sending.

Under these sections, it is clear that, in addition to undisputed actual notice arising from Logan's attendance at the board meeting, Logan received three separate written notices from the board during the notice period.[2] He was provided with a

---

**2.** This cause is before the court on motion for summary judgment. Consequently, the court can grant the defendants' motion only if the court finds that there are no *genuine* issues of *material* fact. The question of whether notice was given is clearly material, as the outcome of that determination will essentially decide whether the contract was breached. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, ——, 106 S.Ct. 2505, 2510, 92 L.Ed.2d 202, 211 (1986); *St.*

copy of the minutes authorizing termination of the contract. These minutes contain the authorizing resolution and are signed by the secretary of the board. This giving of notice would suffice to terminate the contract even if the court adopted the actual delivery to the person test urged by the plaintiff and co-plaintiff intervenor. A registered letter was mailed on December 13 and a notice for delivery was placed in the mailbox at Logan's business address. The mailing was a proper sending under § 75–1–201(38), the act of mailing was a "giving" of notice under § 75–1–201(26), and the deposit of a notice for delivery was a proper receipt of notification under § 75–1–201(26)(a). A letter was hand carried to Logan's offices and left on his secretary's desk over her protest. This constitutes a proper receipt under § 75–1–201(26). Since "receipt of any writing or notice within the time at which it would have arrived if properly sent has the effect of a proper sending," it also constitutes a proper sending under § 75–1–201(38) and a "giving" of notice under § 75–1–201(26). Because notice was properly given and the termination authorized by the action of the board, the contract was not breached. No cause of action for breach of contract or tortious interference with a business relationship arises from the termination. The motion for summary judgment as to all parties on the underlying claim is granted.

An order in conformity with this opinion shall issue.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The motions for summary judgment on the grounds of immunity of public officials in discharge of their discretionary duties

made by Jessie L. Vanderford, individually; Leroy Hopkins, individually; Harold Patrick, individually; Clarence Paul, individually, and William C. Odom, Jr., individually, are hereby granted. The motion for summary judgment by all defendants on the underlying merits of the case is hereby granted.

*Amant v. Benoit,* 806 F.2d 1294, 1297 (5th Cir. 1987). It is equally clear that under Mississippi Code Annotated § 75–1–201(26) and (38) the question of receipt is not a genuine issue. A genuine issue of fact is one that can "properly be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at ——, 106 S.Ct. at 2511, 91 L.Ed.2d at 211. This means that once the moving party has adequately supported his motion for summary judgment, the nonmovant must show in the pretrial record sufficient evidence to permit the plaintiff to win at trial or to overcome a motion for directed verdict were one made on the same collection of facts. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). *See generally,* Childress, *A New Era for Summary Judgment: Recent Shifts at the Supreme Court,* 4 Fifth Circuit Reporter 461 (1987). This the plaintiffs have failed to do as the discussion *infra* will illustrate.