728 F.2d 177
 BANK OF NOVA SCOTIA
v.
ST. CROIX DRIVE-IN THEATRE, INC., St. Thomas Drive-In
Theatre, Inc., Marvin Mahan, and H.E. Lockhart
Development Corporation.
Appeal of BANK OF NOVA SCOTIA, in No. 83-3074, Appellee in
No. 83-3055.
Appeal of ST. CROIX DRIVE-IN THEATRE, INC., St. Thomas
Drive-In Theatre, Inc., in No. 83-3055, Appellees
in No. 83-3074, H.E. Lockhart
Development Corporation,
Appellee in Nos.
83-3055 and 83-3074.
 Nos. 83-3055, 83-3074.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 6, 1983.
Decided Feb. 16, 1984.
 
 Warren B. Cole (argued), Isherwood, Hunter & Colianni, Christiansted, St. Croix, U.S. V.I., for Bank of Nova Scotia.
 Joel H. Holt (argued), Holt & Groner, Christiansted, St. Croix, U.S. V.I., for St. Croix Drive-In Theatre, Inc. and St. Thomas Drive-In Theatre, Inc.
 John G. Short, George H.T. Dudley (argued), Dudley Dudley & Topper, Charlotte Amalie, St. Thomas, U.S. V.I., for H.E. Lockhart Development Corp.
 Before HUNTER, WEIS and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 WEIS, Circuit Judge.
 
 
 1
 In this Virgin Islands case, the district court held that a lessor in the real estate development business was not a compensated surety. Therefore, when the creditor granted the tenant an extension of time for repayment of a loan, the lessor/surety was discharged from its obligation under a tripartite agreement. The court also found that the parties had intended that a mortgage given to the creditor apply only to a leasehold and not the fee interest. We agree with these conclusions and will affirm.
 
 
 2
 After a bench trial, the district court entered judgment in favor of the H.E. Lockhart Development Company as surety and against the creditor, Bank of Nova Scotia. It also entered judgment in favor of the Bank against the principal debtors, St. Croix Drive-In Theatre, Inc. and St. Thomas Drive-In Theatre, Inc. 552 F.Supp. 1244 (V.I.1982).
 
 
 3
 The case arose out of the failure of St. Croix Drive-In and St. Thomas Drive-In to repay the Bank a loan of $400,000. The funds had been advanced to St. Croix Drive-In, in part, so it could pay off some obligations. St. Croix also transferred $250,000 of the loan to its newly-formed subsidiary, St. Thomas Drive-In. That organization planned to open a theater on St. Thomas and, for that purpose, had secured a ten-year lease of property owned by the Lockhart Development Company. The subsidiary expected to grade the land and erect the structures necessary to carry out its enterprise.
 
 
 4
 Part of the financing arrangements for the new theater consisted of a mortgage on the leasehold, accompanied by a demand mortgage note in the amount of $250,000 given by St. Thomas Drive-In to the Bank. In addition, Lockhart, the Bank, and St. Thomas Drive-In executed a "stipulation" dated November 11, 1971 in which Lockhart agreed not to cancel the lease without notifying the Bank. The stipulation also provided that:
 
 
 5
 "Landlord [Lockhart] further agrees that in the event Tenant [St. Thomas Drive-In, Inc.] shall for any reason default in said mortgage and as a result ... mortgagee [Bank] shall declare the mortgage due and payable in full ... Landlord will exercise the right of cancellation provided for at paragraph 12 of said lease, and upon cancellation thereof, will assume the remaining unpaid principal balance of the mortgage and any accrued interest thereon in all respects as though Landlord had originally executed said mortgage and mortgage note accompanying the same and will henceforth be deemed the mortgagor."
 
 
 6
 Lockhart's potential liability was limited to a principal amount of $250,000.
 
 
 7
 In December 1971, St. Thomas Drive-In gave the mortgage to the Bank, and St. Croix Drive-In furnished guarantees of certain individuals as well as that of St. Thomas Drive-In. The Bank then paid $400,000 to St. Croix Drive-In by a series of installments, the last being made in May 1972. As each payment was made, St. Croix Drive-In and St. Thomas Drive-In gave the Bank a demand note for the amount of the installment. St. Croix Drive-In passed on $250,000 of the total sum to St. Thomas Drive-In.
 
 
 8
 The district court found that Lockhart believed the St. Thomas mortgage was to be retired by installments, but did not know the amounts of the monthly payments. St. Croix, however, had agreed to pay the Bank $5,555.56 per month toward the principal in addition to accrued interest. With this schedule, the loan would be retired in six years.
 
 
 9
 In 1972 and through March 1973, payments were made in accordance with the agreement. Unknown to Lockhart, however, the Bank allocated all the principal payments to the $150,000 principal sum not secured by the St. Thomas mortgage. When payments became delinquent in early 1973, the Bank granted a moratorium on principal payments for six months, and eventually for one year. Later, the Bank agreed to modify the installment terms to allow for the payment of accrued interest and only a small amount of the principal.
 
 
 10
 Lockhart was aware that the Drive-Ins were having financial difficulties and that efforts were being made to work things out with the Bank. However, Lockhart had no knowledge of the moratorium or other modifications to the loan repayment. The Bank gave no notice of these arrangements; nor did Lockhart ever consent to them. For its part, Lockhart did agree to a reduction in the rents being paid it by St. Thomas Drive-In and did express some hope that the new venture would be able to solve its financial problems with the Bank.
 
 
 11
 On May 8, 1974, the Bank sent a letter to Lockhart, advising that the loan was in default. This notice was given, according to the Bank, "in the event we choose to declare the mortgage due and payable in full in the lite [sic] of the stipulation dated November 11, 1971." When the president of Lockhart called the Bank after receipt of the letter, he was surprised to learn that no payments had been credited to the $250,000 principal of the St. Thomas mortgage.
 
 
 12
 The Bank sent three other letters to Lockhart demanding payment of the $250,000 principal plus interest. These letters, dated January 16, 1975, November 3, 1976, and March 2, 1981, were ignored.
 
 
 13
 In April 1980, the Bank filed an action in debt and foreclosure against St. Croix Drive-In and the leasehold on St. Thomas. As required by statute, 28 V.I.C. Sec. 532 (1976), Lockhart was named as an entity with an interest in the leasehold, but no judgment was sought against it.
 
 
 14
 On March 26, 1981, the Bank filed a separate suit against Lockhart. After the two cases were consolidated, the Bank filed an amended complaint in the original action against St. Croix seeking judgment against Lockhart for $250,000 plus interest and also asked for foreclosure against the leasehold. The lease expired in late 1981.
 
 
 15
 The district court found that Lockhart had not consented to the Bank's modifications of the original repayment schedule and therefore, as an uncompensated surety, was discharged from its obligations under the stipulation. The court also decided that the statute of limitations had run on the debt as against Lockhart. Reasoning that actual default by the Drive-Ins had occurred in early 1973, the court determined that the Bank could have enforced a demand that Lockhart assume the principal debt at that time. Therefore, the Virgin Islands six-year statute of limitations, 5 V.I.C. Sec. 31(3)(A), expired in 1979.
 
 
 16
 The Bank conceded in an affidavit filed in January 1982 that, because the lease had expired, the foreclosure claim was moot. The court found that the parties to the stipulation never intended that the mortgage extend to Lockhart's fee in the land, but only to the leasehold. In light of the expiration of the lease, the foreclosure action was dismissed.
 
 
 17
 The Bank appeals, contending that Lockhart was a compensated surety, that it consented to the extensions of time for repayment, and that the statute of limitations did not begin to run until January 16, 1975 when demand for payment of the entire outstanding indebtedness was made on Lockhart. The Drive-Ins have cross-appealed, arguing that foreclosure of the St. Thomas property should have been considered and that they should be pro tanto discharged because of the Bank's delay in proceeding against the Lockhart collateral.
 
 
 18
 * Our recitation of the facts has been restricted to the issues raised in this appeal and does not elaborate on the many complexities that confronted the trial judge in disposing of other issues. The ambiguous nature of some of the documentation, the conflicting relationships between the principal debtors and the various guarantors, as well as the somewhat unusual banking practices followed here, presented problems unique in this area of the law. In the interest of brevity, we will not discuss all of these aspects, but note that the issues on appeal represent but a small part of the litigation generated by the financing of the Drive-Ins.
 
 
 19
 The most critical document with respect to Lockhart's possible liability in this case is the "stipulation." It is not in the form of a guaranty or surety agreement generally used by a bank and is subject to varying interpretations. An additional anomaly is that although the mortgage and accompanying note were given by St. Thomas Drive-In, the Bank took additional demand notes signed by both theater corporations and actually gave the money to the St. Croix Drive-In.
 
 
 20
 The trial transcript reflects that questions about these arrangements and other issues were raised in the district court, but the appeals do not dispute the court's resolution of many of these matters. The separate corporate identities of the two Drive-Ins, for example, and the Bank's disbursement of the principal to only one of them have not been pressed in this court. In light of the fashion in which the appeals have been presented to us, we approve the district court's treatment of the "stipulation" as a surety or guaranty agreement.
 
 
 21
 Relying on the RESTATEMENT OF SECURITY Sec. 82, the district court held that Lockhart was not a "compensated surety." In the Restatement, that term is applied to "a person who engages in the business of executing surety contracts for a compensation called a premium, which is determined by a computation of risks on an actuarial basis." RESTATEMENT OF SECURITY Sec. 82, Comment i (1941). Not included in that category are other sureties, even those "receiving some pecuniary advantage, whose surety contracts are occasional and incidental to other business." Id. Lockhart was a corporation active in the field of real estate development. It did not operate a bonding business and clearly was not a compensated surety under the Restatement definition.
 
 
 22
 In the Virgin Islands, the common law as expressed in the Restatement is to be applied as the rule of decision unless supplanted by local law to the contrary. 1 V.I.C. Sec. 4 (1967). No Virgin Islands statute is pertinent to the issue before us, but the Bank characterizes the Restatement of Security as "old" and argues that it no longer reflects the common law accurately. Cf. Varlak v. SWC Caribbean, 550 F.2d 171, 180 (3d Cir.1977). In the Bank's view, any surety that undertakes its obligations for consideration or profit is a compensated surety.
 
 
 23
 Although no Virgin Island case addresses this issue, the Bank in support of its proposition cites decisions from other jurisdictions, such as Honolulu Roofing Co. v. Felix, 426 P.2d 298 (Hawaii 1967), Overly Special School District v. Haber, 193 Wis. 408, 214 N.W. 342 (1927), Standard Accident Insurance Co. v. Mueller, 291 Ill.App. 56, 9 N.E.2d 361 (1937), and Gellis v. S. Gellis & Co., 322 A.2d 287 (Del.Ch.1974), aff'd, 339 A.2d 64 (Del.Super.1975).
 
 
 24
 These cases recognize some limited exceptions to the Restatement's definition, but we are not persuaded that the distinction between compensated and gratuitous sureties should be abandoned. As the Restatement explains, the basis for the distinction is that one in the business of executing surety contracts can be expected to assess the risk involved and charge a compensatory premium accordingly. See RESTATEMENT OF SECURITY Sec. 82, Comment i; Sec. 129, Comment e. Like insurance companies, bonding companies are able, through the volume of their business, to spread the risks over many undertakings so that any single loss will not be disastrous.
 
 
 25
 Persons not in the regular business of writing surety agreements usually have neither the experience of gauging risks nor the ability to average losses over many transactions. The surety, after all, answers for the debt of another and generally in circumstances where there is little or no hope of reimbursement. The possibility of receiving some incidental pecuniary benefit is not enough to deprive the uncompensated sureties of the favored treatment that the law has traditionally offered them.
 
 
 26
 Moreover, the cases cited by the Bank present situations where, because of some special relationship with the principal, the surety was able to exercise some influence or control over the project. For example, in Gellis v. S. Gellis & Co., the sureties were not only large stockholders but officers and directors of the principal corporate debtor. The circumstances in the case at bar do not fall within such an exception to the general rule even if we were disposed to adopt it. In sum, we agree with the district court that Lockhart was an uncompensated surety.
 
 
 27
 Lockhart's status is important because under section 129(1) of the Restatement an uncompensated surety is discharged when, without the surety's consent, the principal and the creditor make a binding agreement to extend the time for payment unless the creditor reserves his rights in the extension agreement. The Bank made no such reservation here when it extended the time for payment by the debtors.
 
 
 28
 The district court found that at no time did the Bank notify Lockhart that it was extending the time for payment of the loan or granting a moratorium on payments of principal. Although an uncompensated surety need not demonstrate prejudice in such circumstances, see RESTATEMENT OF SECURITY Sec. 129(1), the district court observed that, in view of the ten-year term of the lease, delay in satisfaction of the mortgage was unfavorable to Lockhart.
 
 
 29
 The Bank complains that the court erred in finding that Lockhart did not consent to the extensions of time, and quotes testimony of Lockhart's president tending to show acquiescence. However, other testimony by the same officer specifically denies knowledge of any arrangements between the Bank and the debtors. Arriving at a factual conclusion based on an evaluation of the witness's testimony is within the province of the trial court. We may not overrule that finding unless it is clearly erroneous, and that has not been shown here. See Fed.R.Civ.P. 52(a).
 
 
 30
 In any event, we do not disagree with the district court's further observation that silence by a surety in the face of activity by the principal and creditor is not ordinarily regarded as acceptance or consent to changes in the original arrangements. See A. Stearns, LAW OF SURETYSHIP, Sec. 6.33 at 159 (1951). If the Bank had wished to secure rights more favorable to it than the common law permits, an appropriate agreement could have been prepared. The Bank, however, took no steps to amplify or clarify the "stipulation" with Lockhart and is now bound by it as written.
 
 
 31
 Having concluded that Lockhart's obligations were discharged by the Bank's extensions of time for repayment, we need not discuss the statute of limitations defense.
 
 II
 
 32
 The cross-appeal by the Drive-Ins challenges the district court's determination that the parties to the stipulation intended the mortgage to apply only to the leasehold interest. Because the lease expired, the court held that the issue of foreclosure was moot. The Drive-Ins argue that the mortgage covered more than the leasehold and, in fact, extended to the fee itself. As result, they contend, the issue was not moot and foreclosure should be ordered.
 
 
 33
 We question the right of the Drive-Ins to assert any objection to the Bank's conduct with respect to the surety's collateral. As principal debtors, the Drive-Ins are primarily liable to the Bank. Hence, they are in no position to complain about the Bank's dilatory conduct in pursuing Lockhart. Even if there had been recovery from the surety, it would in turn had been entitled to reimbursement from the Drive-Ins.
 
 
 34
 In any event, the district court properly interpreted the stipulation as applicable only to a mortgage of the leasehold. The tenant, St. Thomas Drive-In, could mortgage no more than its interest, which was limited to the leasehold. The stipulation referred only to that mortgage and nothing suggests an undertaking by Lockhart to encumber its fee interest. The court's conclusion is further supported by the affidavit of the mortgagee Bank, which states that by reason of the termination of the lease "the above action is moot insofar as it seeks foreclosure of the mortgage encumbering said estate."
 
 
 35
 We conclude, therefore, that as to the issues raised in these appeals, the district court committed no reversible error. Accordingly, the judgment will be affirmed.