Harry F. DUNCAN, et al., Appellants,

v.

G.E.W., INC., Appellee.

No. 85–1057.

District of Columbia Court of Appeals.

Argued May 13, 1986.

Decided May 28, 1987.

Bardyl R. Tirana, Washington, D.C., for appellants.

Gerson A. Zweifach, Washington, D.C., for appellee.

Before PRYOR, Chief Judge, and TERRY and STEADMAN, Associate Judges.

TERRY, Associate Judge:

In this case we must decide whether a court of equity may relieve a lessee from the consequences of its failure to give timely. notice, as required by the terms of its lease, of its intention to renew the lease. More than just a lease (actually, a series of leases) is involved here. At the heart of this case is the purchase of a chain of restaurants and a series of options to buy the buildings which they occupy, options which cannot be exercised unless the leases are renewed. The trial court granted a declaratory judgment in favor of the lessee, G.E.W., Inc., the effect of which was to prevent a forfeiture of G.E.W.'s lease renewal options, which in turn kept alive the purchase options. The lessors appeal from that judgment, contending that some of the trial court's findings were erroneous and that the lessee should be denied equitable relief because its failure to give timely notice was caused by its own unilateral mistake. On the particular facts of this case, with all the equities on the side of the lessee, we find no error in the trial court's grant of equitable relief; accordingly, we affirm the judgment.

I

In January 1981 appellant LTS Associates (LTS), a partnership consisting of Harry F. Duncan, Robert F. McFadden, and George P. Mathieson, entered into an agreement with appellee G.E.W., Inc., whereby LTS would sell to G.E.W. the assets of Little Tavern Shops, Inc., a chain of sandwich shops in the greater Washington area, for $700,000. Under the agreement, LTS retained an ownership interest in eighteen of the buildings in which the Little Tavern restaurants are located. Fourteen of these properties are involved in this litigation, ten of them in Maryland, two in the District of Columbia, and two in Virginia. Separate leases were executed for the individual properties, but they all contained identical language. In particular, each

lease was for a three-year term that expired on January 31, 1984. Each lease also gave G.E.W. two consecutive renewal options and a purchase option. The renewal options, if exercised, would extend the total term of the leases to ten years, but they required three months' advance written notice prior to the expiration of the term. The purchase options could not be exercised after January 31, 1984, unless G.E.W. also elected to exercise its renewal options. Thus G.E.W. was obliged to give notice to LTS in writing on or before October 31, 1983, that it was exercising its option to renew each individual lease; its failure to do so would result in the loss of not only the renewal options but also the purchase options. The present dispute arose when Gerald E. Wedren, the president and chief executive officer of G.E.W., failed to give LTS written notice of G.E.W.'s intention to renew the leases until November 23, 1983, twenty-three days after the deadline.[1]

On February 8, 1984, appellants[2] informed G.E.W. that they deemed the leases to have expired and intended to treat G.E.W. as a holdover tenant operating under a month-to-month lease. G.E.W. immediately filed this suit for a declaratory judgment and other equitable relief. It also sought and obtained a temporary restraining order which prohibited appellants from interfering with G.E.W.'s continued occupancy of the properties until the court could rule on G.E.W.'s motion for a preliminary injunction. The latter motion was granted a month later, pending a trial on the merits of G.E.W.'s complaint for a declaratory judgment.

The evidence at trial traced the history of the Little Tavern Shops. Harry F. Duncan founded Little Tavern Shops, Inc., in 1927, and was its chairman of the board and chief executive officer until January 1981. In 1968, after many years of profitability, the business began to lose its share of the market. Its sales and profits steadily de-

---

1. Mr. Wedren gave oral notice on November 17, 1983.

2. Appellants are Harry F. Duncan, Robert F. McFadden, and George P. Mathieson, the three

partners in LTS Associates; Liesa McFadden, the wife of Robert McFadden, who has an interest in one of the properties; and LTS itself.

clined, and in 1980 the officers of the corporation decided that it was time to sell the business. They retained a broker to aid them in the sale, but G.E.W. was the only prospective purchaser that actually made a written offer of purchase.

Mr. Wedren, who negotiated the purchase agreement on behalf of G.E.W., recognized that purchasing the restaurant chain involved a "tremendous risk," and that substantial improvements would have to be made in order to "turn the company around." Therefore, instead of buying the Little Tavern buildings outright for G.E.W., he insisted upon lease renewal and purchase options in order to minimize the risks associated with the purchase of the business; in his view, much effort and time would be needed to improve the business' reputation and to obtain an adequate return on G.E.W.'s investment. It is not disputed that the options were, as appellant Mathieson testified, "part and parcel of the acquisition agreement."

By April 1983 G.E.W. had begun to make substantial improvements and alterations to the restaurant properties. In June 1983 G.E.W. obtained a $400,000 loan from the National Savings and Trust Bank. The bank was made aware of G.E.W.'s intention to renew the leases, and the loan was to be secured by pledging the leaseholds as collateral. Because the bank insisted that the leases extend through the five-year life of the loan, it required not only G.E.W.'s commitment to renew them but also the lessors' consent to the pledging of the leaseholds. Accordingly, Mr. Wedren obtained the written consent of Mr. Duncan and Mr. Mathieson to the assignment of some of the leaseholds as collateral for the bank loan.

G.E.W. spent the full amount of the loan, along with some of its own capital, on leasehold improvements. It purchased new equipment for heating, plumbing, cooking, and refrigeration. The menus of all the Little Taverns were expanded, and a few of the restaurants were completely remodeled.

The trial court found that appellants "were aware of these improvements and

fully expected [G.E.W.] to exercise some of the purchase options." Duncan, Mathieson, and Wedren all worked in the same suite of offices during 1983, Wedren having acceded to a request by Duncan's wife to permit Duncan and Mathieson to use some of G.E.W.'s office space. In fact, Mr. Mathieson testified that his desk was less than fifty feet from Mr. Wedren's office. He also acknowledged that he had seen and spoken with architects and workmen in G.E.W.'s offices and that he knew G.E.W. was making "considerable improvements to all [of the] shops." Mathieson said he "never had any doubt that [Mr. Wedren] would exercise some of the options." Mr. Duncan also testified, "I thought he would renew all of them, based upon the fact that he was building up the properties."

The lease renewal option is found in Article 18 of each lease. It reads as follows:

> *Section 18.01.* Lessor hereby grants to lessee the right, at lessee's option, to extend the term of this lease for two separate and additional terms after the expiration of the initial term hereof, upon the terms (other than length of term) herein specified. The first such additional term, hereinafter referred to as the first renewal term, is the time period indicated [in] Article First, section 1.09 hereof. The second such additional term, hereinafter referred to as the second renewal term, is the time period indicated in Article First, section 1.10 hereof. The second renewal term may be elected only if the lessee has previously elected the first renewal term. Both renewal options are conditioned upon the lessee's not then being in default on any of the provisions and conditions of this lease. *These options shall be exercised by written notice given to lessor or delivered or mailed to lessor,* at the address at which the rent is then payable, *at least three (3) months before the expiration of the initial term hereof or first renewal term hereof.* The parties hereto agree that a new lease need not be executed upon the exercise of any of these options, but that this lease will remain in full force and effect, changed only as to

the matters specified in this article. [Emphasis added.][3]

G.E.W. asserted at trial that the lease renewal terms were ambiguous. Mr. Wedren testified that in April of 1981, three months after purchasing the business, he reviewed the leases, including the language in section 18.01. He concluded that the use of the plural, "these options," followed by the disjunctive "or," meant that the remainder of the sentence did not require three months' advance notice unless G.E.W. wished to exercise *both* options before the end of the initial term. Mr. Wedren believed that if G.E.W. was interested in exercising only the first renewal option, but not both, then the three-month notice requirement did not apply, and G.E.W. could follow the usual landlord-tenant standard of "reasonable notice"—thirty days— by giving notice on December 30, 1983.[4] Accordingly, knowing that he would consider exercising the options in the future, Mr. Wedren made an entry in his diary at the page for December 15, 1981, which he transferred to the 1982 and then the 1983

diaries, reminding him of what he believed to be the December 30 deadline. Seeing the notation in the diary, he anticipated, would alert him that he had only two weeks in which to submit the notice.[5]

By the spring of 1983, according to Mr. Wedren, G.E.W. had decided to renew all of the leasehold options and fully intended to do so. On November 17, 1983, Mr. Wedren's secretary told him that Mr. Mathieson had informed her that G.E.W. was late in renewing its options and would therefore be evicted. Mr. Wedren immediately advised Mr. Mathieson that he read the leases differently, and that G.E.W. fully intended to exercise the options. Six days later, on November 23, G.E.W. gave formal written notice of its intention to renew the leases.

Appellants acknowledged at trial that neither Mr. Duncan nor Mr. Mathieson was aware of G.E.W.'s delay in giving notice until November 16, when Mr. McFadden told Mr. Mathieson that he thought Mr. Wedren was late. Appellants also do not assert that they relied in any way upon

---

**3.** The purchase option is set forth in Article 15 of each lease:

*Section 15.01.* Lessor agrees that lessee shall have an option to purchase the property specified in Article First, section 1.06 hereof, for the option price as specified in Article First, section 1.07 hereof. This purchase option may be exercised at any time this lease is in effect prior to the expiration of the purchase option period, and provided that lessee is not then in default. Said purchase option period commences on the commencement date of the initial term of this lease and terminates upon the expiration of the purchase option term as specified in Article First, section 1.08 hereof. *In the event the purchase option term specified in this article extends beyond the initial term of this lease, the lessee must have elected to renew this lease for the first renewal term as provided for in Article Eighteenth hereof, in order to exercise this purchase option after the expiration of the initial term.* [Emphasis added.]

Section 1.07 of each lease stated the selling price for the property to which the lease applied. The effect of this provision was to allow G.E.W., at its option, to purchase all the shops at 1981 prices. Thus the controversy between the parties is, at bottom, a dispute over which of them will benefit from the increase in the value of the properties since 1981.

**4.** Edward Dixon, G.E.W.'s former comptroller, testified that sometime in 1983 he was asked to prepare a schedule listing appellants' properties.

Mr. Dixon said that he reviewed the schedule with Mr. Wedren, calling to his attention the fact that three months' notice was required to exercise the lease renewal options, and that Wedren acknowledged this requirement. Mr. Wedren, however, emphatically denied ever making such an acknowledgment, much less discussing the notice requirements with Mr. Dixon.

**5.** G.E.W. also presented the testimony of a linguistics expert, Professor Gilbert Couts, to demonstrate that Mr. Wedren's interpretation was reasonable and that the ambiguity he perceived was genuine. In particular, Professor Couts testified that the literal meaning of the notice requirement in section 18.01, read in context, was that notice could be given either before the expiration of the initial term or before the expiration of the first renewal term. Professor Couts explained that if the drafter of section 18.01 had wanted the tenant to provide the landlord with three months' notice before the end of the initial term, as well as three months' notice before the end of the first renewal term, the drafter should have changed "or" to "and" and added the word "respectively," so that the sentence would have read, "These options shall be exercised . . . at least three months before the expiration of the initial term hereof *and* [the] first renewal term, hereof, *respectively.*"

G.E.W.'s delay; in fact, Mr. Mathieson testified that appellants "took no action whatsoever in reliance upon the delay."

After hearing the testimony and examining the exhibits presented at trial, the court concluded that G.E.W. had "effectively exercised its lease renewal options and preserved its purchase options in accordance with Section 18.01 of the leases...." The court stated in its order that although Mr. Wedren's view of the terms of the leasehold options was "incorrect," it believed that Wedren had simply made an "honest mistake," which was "understandable in light of the complexity of the language of the option, and the length of time which passed from the time the agreement was executed." In the court's view, the equities were decidedly on the side of G.E.W., and appellants had not relied to their detriment on the delay. Accordingly, the court entered judgment in favor of G.E.W.

## II

■ Appellants first contend that the trial court erred in crediting Mr. Wedren's testimony and concluding that he had made an honest mistake in interpreting the lease provisions. They note that Mr. Dixon, the former comptroller of G.E.W., testified that he provided Mr. Wedren with actual knowledge of the three-month notice requirement. While it is true that Dixon did so testify, it is also true that Wedren testified otherwise. Much of Mr. Dixon's testimony was impeached on cross-examination, and the trial court chose to believe Mr. Wedren, as it was entitled to do. "We are obliged to treat findings of fact made by the trial court sitting without a jury 'as presumptively correct unless they are clearly erroneous or unsupported by the record.'" *Bedell v. Inver Housing, Inc.*, 506 A.2d 202, 205 (D.C.1986), quoting from *Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543, 546 (D.C.1981). Because the record supports the trial court's finding on this issue, we cannot upset that finding on appeal.

■ Appellants also maintain that regardless of whether Mr. Wedren had actual knowledge, Mr. Dixon's knowledge should

be imputed to G.E.W. as a corporation. *See Capital View Realty Co. v. Meigs*, 92 A.2d 765, 766 (D.C.1952). We disagree. Even if we accept as true Mr. Dixon's testimony that he was aware of the three-month notice requirement, that does not affect the trial court's finding that Mr. Wedren made an honest mistake. G.E.W. never claimed that, as a corporation, it did not have knowledge of the notice requirement; rather, it merely claimed that it misinterpreted the section of the lease in which that requirement was stated. Thus whether Dixon correctly interpreted the lease is irrelevant because he "had no duty to act upon or report it." *Sutton Mutual Insurance Co. v. Notre Dame Arena, Inc.*, 108 N.H. 437, 440–41, 237 A.2d 676, 679 (1968); *see also Barcon Associates, Inc. v. Tri-County Asphalt Corp.*, 160 N.J.Super. 559, 574–76, 390 A.2d 684, 692 (1978) (knowledge of corporate employee will be imputed to corporation "only where the corporate employee has some functional responsibility with respect to the knowledge or notice"), *aff'd*, 172 N.J.Super. 186, 411 A.2d 709 (1980), *aff'd*, 86 N.J. 179, 430 A.2d 214 (1981). There was no evidence that Mr. Dixon had any role to play in deciding whether or when to exercise the lease renewal options. Rather, the evidence suggests that Mr. Wedren, the president and chief executive officer of the corporation and the man who negotiated the entire deal, was solely responsible for making those decisions. Moreover, even assuming that Dixon told Wedren that three months' notice was required, the trial court was entitled to find that Mr. Wedren interpreted the provisions differently. Thus the finding that Mr. Wedren made an honest mistake, irrespective of what Mr. Dixon thought, is the only finding of relevance that need concern us on this appeal.

## III

■ The trial court made a choice-of-law ruling and determined that the law of Maryland was controlling. Appellants argue that *Filson v. Fountain*, 84 U.S.App. D.C. 46, 171 F.2d 999 (1948), *rev'd on other grounds*, 336 U.S. 681, 69 S.Ct. 754, 93

L.Ed. 971 (1949), requires this court to apply the law of the state in which the property is located. Because some of the leases relate to property located in Virginia and the District of Columbia, appellants assert that it was error to apply Maryland law to all fourteen leases.

It is difficult to understand why appellants have taken issue with the trial court's choice-of-law ruling, when they readily admit in their brief that "the published decisions of the courts of the District of Columbia, Virginia, and Maryland are in accord on the law of options." The case law demonstrates that this statement is correct, and that there is thus no reason to make a choice-of-law ruling; there is, in fact, no conflict of law in this case. All three jurisdictions abhor a forfeiture and will permit equity to intervene if the circumstances are compelling. *See, e.g., Entrepreneur, Ltd. v. Yasuna,* 498 A.2d 1151, 1165 (D.C.1985) (" 'it is fundamental that forfeitures of purchase options in leases are not favored' " (citations omitted)); *Myers v. Silljacks,* 58 Md. 319, 329 (1882) (equity will afford relief "in a proper case"); *Banks v. Haskie,* 45 Md. 207 (1876) (court prevented forfeiture when tenant was late in providing notice to renew, but landlord's injury was compensable); *McClellan v. Ashley,* 200 Va. 38, 42–43, 104 S.E.2d 55, 58 (1958) (equitable relief available if there is fraud, mistake, surprise, or accident); *cf. Clayman v. Totten,* 56 App.D.C. 115, 10 F.2d 910 (1926) (lessee failed to allege "any peculiar equity" as excuse for delay). Moreover, the case law in these three jurisdictions is sparse with respect to when equity should intervene to prevent forfeitures of lease renewal options. Thus, regardless of which jurisdiction's law we might apply, we would be forced to look to the general principles followed in other jurisdictions; and so far as we can tell, the law of Virginia, Maryland, and the District of Columbia does not materially differ from those general principles. Therefore, because it would make no difference which jurisdiction's law is deemed controlling, we need not decide the choice-of-law issue in this case.[6]

## IV

■ Our search for the general principles to which we refer leads quickly to the leading case in this area, *American Houses, Inc. v. Schneider,* 211 F.2d 881 (3d Cir.1954), on which the trial court relied. The court declared in *American Houses:*

Where a lease gives the lessee a privilege of renewal which may be exercised by notice to the lessor at or before a specified time, it may happen that the notice is tardy and the lessor refuses to honor it. Rather frequently a lessee in this position will ask a court of equity to relieve him of the strict letter of his bargain, arguing on the one hand that the failure to receive notice on or before the due date did not cause the landlord to change his position, and on the other that loss of the contemplated renewal would work a great and irreparable hardship upon the lessee. It is rather generally considered within the province of equity

---

6. Even if we were to apply the interest analysis principles found in the RESTATEMENT (SECOND) OF CONFLICT OF LAWS (1969), which G.E.W. asserts we adopted in *Finance America Corp. v. Moyler,* 494 A.2d 926, 929 & n. 7 (D.C.1985), the choice-of-law decision would in all likelihood be that Maryland law should apply. The initial purchase agreement called for Maryland law to govern the performance of the contract, and the leasehold options were explicitly incorporated into the agreement. Moreover, it was undisputed, as appellant Mathieson admitted, that the leasehold options were "part and parcel of the acquisition agreement." These factors would suffice to resolve the matter in favor of Maryland law. *See* RESTATEMENT, *supra,* § 187(1). Additionally, ten of the fourteen properties are located in Maryland, G.E.W.'s principal place of business is in Maryland, and three of the four appellants reside in Maryland. *See id.* § 188(2)(d), (e). Applying the law of three separate jurisdictions, even assuming there were some differences, would disserve the Restatement's principle of uniformity. *See Lee v. Hunt,* 631 F.2d 1171, 1175–1176 (5th Cir.1980), *cert. denied,* 454 U.S. 834, 102 S.Ct. 133, 70 L.Ed.2d 112 (1981) (court, following Restatement, applied law of Texas even though some of the property was located in Louisiana). Thus a conflict-of-laws analysis would almost certainly favor application of Maryland law. And because there is very little Maryland precedent on the issue of when equity will intervene to prevent a forfeiture of leasehold options, we would be compelled to look to general principles, which we must do in any event.

to consider such claims, and in real hardship cases to allow a renewal despite slight, relatively inconsequential and excusable tardiness.... We believe this is sound and salutary equity doctrine and practice.

*Id.* at 883 (citations omitted).

Of course, equity will not always intervene, and when it does not, an optionee is required to comply strictly with the terms of the option agreement. *See, e.g., Clayman v. Totten, supra,* 56 App.D.C. at 115, 10 F.2d at 910 ("The three months' notice required by the lease was a condition precedent, which the lessees were bound to comply with before they could claim the right to a renewal"); *Foard v. Snider,* 205 Md. 435, 440, 109 A.2d 101, 106 (1954) ("Whatever the option requires must be done"); *McClellan v. Ashley, supra,* 200 Va. at 43, 104 S.E.2d at 58 ("time is of the essence of the option to renew, and the provision for the notice is a condition precedent upon the performance of which the lessee's right to renew depends"). However, "it appears that all courts which have dealt with the issue in recent years have recognized that there can be special circumstances which may warrant equitable relief from a lessee's failure or delay in giving notice to renew an option in its lease." Annot., 27 A.L.R. 4TH 266, 270 (1984); *see, e.g., Simons v. Young,* 93 Cal.App.3d 170, 155 Cal.Rptr. 460 (1979) (fraud, accident, or mistake; hardship to lessee); *Jones v. Gianferante,* 305 N.Y. 135, 111 N.E.2d 419 (1953) (honest mistake, or similar excusable fault; landlord not prejudiced); *Ward v. Washington Distributors, Inc.,* 67 Ohio App.2d 49, 425 N.E.2d 420 (1980) (accident, fraud, surprise, or honest mistake; lessor not prejudiced; other special circumstances). "Regardless of the reason for the failure in notice, it is generally stated that equity will intervene only if (1) the tenant's delay in renewing was slight, (2) delay did not prejudice the landlord, and (3) failure to grant relief would cause a tenant unconscionable hardship." Annot., *supra,* 27 A.L.R. 4TH at 271.

The case law further distinguishes between mere neglect on the part of the lessee, in which case equity will not grant relief, *Reynolds-Penland Co. v. Hexter & Lobello,* 567 S.W.2d 237 (Tex.Civ.App. 1978),[7] and an honest mistake, which often permits the intervention of equity. *See, e.g., Wharf Restaurant, Inc. v. Port of Seattle,* 24 Wash.App. 601, 605 P.2d 334 (1979). In this case the trial court was satisfied that G.E.W.'s failure to provide timely notice "was the result of an honest mistake." Mr. Wedren misinterpreted the language of the leasehold options, and the trial court credited his testimony, concluding that, although "incorrect," his interpretation was "understandable." Since the record supports this conclusion, we must accept it. *See Bedell v. Inver Housing, Inc., supra,* 506 A.2d at 205; *Auxier v. Kraisel,* 466 A.2d 416, 418 (D.C.1983).[8]

Several additional factors in this case support the granting of equitable relief to G.E.W. First, and most significantly, G.E.W. made substantial improvements worth more than $400,000 in the fourteen properties at issue. Because of these improvements, appellants would receive a very substantial windfall if the strict terms of the option were enforced, while G.E.W. would suffer irreparable loss if equity did not intervene. Second, the delay in giving notice was slight; oral notice was provided within seventeen days of the deadline, and written notice six days after that. Third, the evidence shows that G.E.W. had made up its mind to renew the leases as early as the spring of 1983, when it obtained a loan from the bank, and that appellants had every expectation that G.E.W. would exercise its renewal options. In fact, appellants

---

7. *But see F.B. Fountain Co. v. Stein,* 97 Conn. 619, 118 A. 47 (1922) (even in cases of mere neglect, equity will grant relief if not doing so would result in severe hardship to lessee).

8. Moreover, it is clear that G.E.W.'s failure to provide appellants with timely notice of renewal was not the result of mere neglect. The evidence shows that Mr. Wedren fully intended to renew the leases, but that he mistakenly made an entry in his diary to give appellants thirty days' notice rather than ninety days' notice. Had G.E.W.'s delay resulted from mere neglect, rather than Mr. Wedren's honest mistake, we would be far less inclined to rule in its favor.

were fully aware of the improvements that G.E.W. was making, and they consented to the assignment of the leaseholds as collateral for the loan. Finally, appellants did not rely to their detriment on G.E.W.'s failure to give timely notice of renewal; indeed, they were not even aware of the failure until approximately the sixteenth day after the deadline. In these circumstances we are convinced that forfeiture of the lease renewal options would be unconscionable. *See, e.g., American Houses, Inc. v. Schneider, supra,* 211 F.2d at 884 (court granted equitable relief after determining that case was one of "genuine hardship" to lessee who had made "substantial improvements," and that "lessor did not change his position in the interval"); *Ward v. Washington Distributors, Inc., supra,* 67 Ohio App.2d at 54, 425 N.E.2d at 424 ("where the lessee has made valuable improvements to the leased premises, the lessee should not be denied equitable relief from his own neglect or inadvertence if a forfeiture of such improvements would result—provided there is no prejudice to the landlord" (citations omitted)); *Wharf Restaurant, Inc. v. Port of Seattle, supra,* 24 Wash.App. at 612, 605 P.2d at 341 ("inequitable forfeiture would have resulted had equity not intervened," when "permanent improvements had been made on the premises by the lessee with the intention of exercising its option and remaining on the premises").

Appellants also urge reversal as a matter of policy. They contend that these leases were the result of an arm's-length commercial transaction between sophisticated businessmen, and that the parties should be bound by the strict terms of their bargain. They further contend that if we permit equity to relieve G.E.W. from its own failure to give timely notice, we shall be encouraging much unwanted litigation, creating havoc in the commercial real estate market, and sacrificing the certainty and predictability so essential to all business transactions. We see no such dire consequences flowing from a case like this, in which a court, by enforcing a series of options that everyone expected to be exercised, is in fact promoting the real commercial expectations of the parties. A forfeiture of the options in this case would cause unconscionable hardship to one party, which should never be the goal—or the effect—of any commercial transaction.

■ To hold for appellants would be a regression to the days when hypertechnical legal arguments were relied upon to prevent fair and just results. We believe a more worthy result is one that fulfills the commercial expectations of the parties and avoids unconscionable hardship. The real estate community, however, may rest assured that lease options remain enforceable, and that as a general rule they will be strictly enforced according to their terms. We emphasize that equitable relief from the strict terms of a renewal or purchase option is the rare exception to this rule. Such relief will not even be considered unless the party seeking it can make a strong showing (1) that the failure to give the required notice was the result of an honest mistake, and not mere neglect, (2) that the delay, if any, in giving notice was slight, (3) that the other party did not rely to its detriment on the failure to give the required notice, and (4) that enforcement of the strict terms of the option will result in unconscionable hardship. Because G.E.W. has made such a showing here, the judgment in its favor is

*Affirmed.*