**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 11-3238

_____

WARMINSTER EQUITIES, LLC,

Appellant

v.

WARMINSTER COMMERCE, LLC
C/O Colin Development, LLC

v.

ABINGTON SAVINGS BANK

_____

No. 11-3286

_____

WARMINSTER EQUITIES, LLC

v.

WARMINSTER COMMERCE, LLC
C/O Colin Development, LLC

v.

ABINGTON SAVINGS BANK

Warminster Commerce, LLC,

Appellant

_____

On Appeal from the United States District Court

for the Eastern District of Pennsylvania
(No. 2-10-cv-00520)
District Judge:  Honorable Ronald L. Buckwalter

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
September 14, 2012
_____

Before:  SMITH and CHAGARES, <u>Circuit Judges</u>, and ROSENTHAL, <u>District Judge</u>.[*]

(Filed: September 19, 2012)
_____

OPINION
_____

CHAGARES, <u>Circuit Judge</u>.

This is an appeal and cross-appeal from the District Court's adjudication on summary judgment of a real estate dispute concerning the expiration of a commercial property lease.  We will affirm in all respects except one.

I.

We write solely for the parties and will, therefore, recount only those facts that are essential to our disposition.  This action arose from the lease of commercial real property ("the Leased Premises") by plaintiff and lessee, Warminster Equities, LLC ("Equities"), from the defendant, third-party plaintiff, and lessor, Warminster Commerce, LLC ("Commerce").  The lease of the Leased Premises ("the Lease") was originally executed in 1973 between American Property Investors ("API"), the lessor, and Pennfood Associates ("Pennfood"), the lessee, and had an initial term of twenty-seven years.  The

_____

[*]  The Honorable Lee H. Rosenthal, United States District Judge for the Southern District of Texas, sitting by designation.

2

Lease also provided the lessee with an option to exercise seven consecutive ten-year extensions so long as the lessee gave the lessor written notice at least twelve months prior to the expiration of the then-current term. Pennfood exercised the option on December 1, 1998, extending the Lease for another ten years. On May 10, 2001, Equities purchased Pennfood's leasehold interest in the Leased Premises and its ownership of the improvements thereon.

Meanwhile, on January 4, 2001, Equities subleased the Leased Premises to Commerce Bank (which later became TD Bank) ("TD Bank") for a term of twenty years with an option to extend for four consecutive five-year terms. Additionally, on May 24, 2001, Equities borrowed $2,400,000 from third-party defendant Abington Savings Bank ("Abington") to make improvements to the Leased Premises. The loan was secured by Equities's leasehold estate, the improvements thereon, and the assignment of all rents received from tenants on the Leased Premises. TD Bank also proceeded to construct a bank building ("the TD Bank building") at its own expense on the Leased Premises.

The dispute underlying this litigation commenced when the deadline for exercising the option to extend the Lease for another ten years, December 31, 2008, came and went without written notice from Equities to Commerce of its intent to exercise the option. On March 24, 2009, Commerce notified Equities by letter that it had not received written notice of Equities's intent to exercise its option to extend the Lease and, therefore, the Lease would expire on December 31, 2009. In response, Equities sent a letter to Commerce on April 2, 2009 declaring its intent to exercise the option.

Commerce responded that the April 2 letter was not a valid extension notice, as it was sent after December 31, 2008.

Equities thereafter filed this action on February 4, 2010, seeking, inter alia, a declaratory judgment that it had validly exercised its option and the Lease had not expired. Commerce joined Abington to the action and filed a counterclaim against it, asking the court to declare that the Lease expired on December 31, 2009 and that Abington's leasehold mortgage was satisfied or released. Abington then asserted counterclaims against Commerce, seeking, inter alia, a declaration that its leasehold mortgage remained in effect or, if the court determined that the Lease had expired, that it maintained an interest in the improvements on the Leased Premises or the rents from those improvements.

On December 21, 2010, the District Court granted Commerce's motion for summary judgment and dismissed Equities's complaint in its entirety. On August 4, 2011, upon motions for summary judgment filed by all three parties, the District Court (1) granted Commerce's motion with respect to its request for a declaration that the Lease had expired on December 31, 2009 and neither Equities nor Abington was entitled to subrent from TD Bank; (2) denied Commerce's motion and granted Abington's motion with respect to Abington's request for a declaration that is leasehold mortgage interest and interest in the TD Bank building remained intact; and (3) denied Commerce's motion and granted Equities's motion with respect to the ownership of the TD Bank building, holding that it was an improvement that Equities was entitled to sell to Commerce. Equities and Commerce timely appealed those holdings.

4

## II.

The District Court had diversity jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 and we have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291. We review the District Court's decision on a summary judgment motion de novo. Spence v. EASB Grp., Inc., 623 F.3d 212, 216 (3d Cir. 2010). We are "required to apply the same test the district court should have utilized initially." Kach v. Hose, 589 F.3d 626, 634 (3d Cir. 2009) (quotation marks omitted). Summary judgment is appropriate when the Court concludes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether such relief is warranted, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

## III.

## A.

The first issue on appeal is whether the District Court properly determined that the Lease expired on December 31, 2009. For the following reasons, we agree with the District Court.

In a diversity case, we "are required to apply the substantive law of the state whose laws govern the action." Robertson v. Allied Signal, Inc., 914 F.2d 360, 378 (3d Cir. 1990). Under Pennsylvania law, with an option such as the one in the Lease, "[t]ime is always of the essence." W. Sav. Fund Soc'y of Phila. v. Se. Pa. Transp. Auth., 427 A.2d 175, 178 (Pa. Super. Ct. 1981) (quoting New Eastwick Corp. v. Phila. Builders, 241

5

A.2d 766, 769 (1968)).[1]  "[E]quity will not aid the tardy optionee" when the optionee's failure to exercise the option by the prescribed deadline is due solely to his or her own negligence.  Finkle v. Gulf & W. Mfg. Co., 744 F.2d 1015, 1019 (3d Cir. 1984).  "This principle applies even in the absence of detriment to the optionor."  Id. at 1020.[2]

> The option in the Lease declares that the

> Lessee shall have the right, at its option, to extend the term of this Lease for seven (7) consecutive renewal terms of ten (10) years . . . by giving the Lessor notice of such election to extend not later than twelve (12) months prior to the expiration of the basic term or the then current extended term.

Joint Appendix ("JA") B55.  The Lease provides that "[a]ll notices and other communications hereunder shall be in writing and . . . shall be sent by first class . . . registered United States mail."  Id. at B43.

Equities does not dispute that it failed to provide written notice of its intent to exercise the option by the December 31, 2008 deadline.  Instead, Equities maintains that it gave oral notice on several occasions when one of its principals, Vernon Hill III, spoke with the principal of Commerce, Fred Colin.  Equities alleges that Hill told Colin that Equities intended to remain on the Property "forever" and had expressed its interest in purchasing Commerce's interest in the land on a number of occasions.  Equities Br. 11.  Commerce responds, and the District Court held, that there is no evidence in the record

---

[1]  The parties agree that Pennsylvania law applies in this case, as do we.

[2]  In its reply brief, Equities argues that conventional landlord-tenant contract principles should not apply here because the Lease was for a long-term ground tenancy rather than a short term rental.  Equities cites to no case law supporting such disparate treatment, however.  Furthermore, Equities waived this argument by failing to raise it in the District Court or in its opening appellate brief.

that Colin understood Hill's remarks as unequivocal notice of his intent to exercise the option to extend.

We agree with the District Court that Equities did not give proper notice of its desire to exercise the option and that equitable relief is not appropriate here. Equities cites cases holding that enforcing a written notice requirement in a lease would be inequitable under the circumstances. None of those cases supports overlooking the plain language of the contract in this case. For instance, Equities cites American Homes, Inc. v. Schneider for the proposition that,

> Where a lease gives the lessee a privilege of renewal which may be exercised by notice to the lessor at or before a specified time, it may happen that the notice is tardy and the lessor refuses to honor it. Rather frequently a lessee in this position will ask a court of equity to relieve him of the strict letter of his bargain, arguing on the one hand that the failure to receive notice on or before the due date did not cause the landlord to change his position, and on the other that loss of the contemplated renewal would work a great and irreparable hardship upon the lessee. It is rather generally considered within the province of equity to consider such claims, and in real hardship cases to allow a renewal despite slight, relatively inconsequential and excusable tardiness.

211 F.2d 881, 883 (3d Cir. 1954). That case is inapposite, however, because the time for giving notice was based on "the termination of the present national emergency" and, as such, was not entirely clear to the lessor. Id. Here, the written notice requirement and deadline were unambiguous.

In other cases cited by Equities, the lessee's late satisfaction of the notice requirement was excused because it was due to evasive actions on the part of the lessor, see Matter of Opus One, Inc., 33 B.R. 190 (Bankr. W.D. Pa. 1983) and Brunswick Hills Racquet Club v. Route 18 Shopping Center, 864 A.2d 387 (N.J. 2005), or the lessor's

7

apparent acceptance of the late notice by remaining silent while continuing to accept rent, enter into subsequent agreements relating to the rental payments, and operating in the same manner as it had under the lease, see H.F.D. No. 26, Inc. v. Middletown Merch. Mart, 467 F.2d 253 (3d Cir. 1972). In one of the cases Equities cites, the court held that the optionee's late exercise of an option was an "honest mistake" and excusable because the notice requirement in the lease was ambiguous. Duncan v. G.E.W., Inc., 526 A.2d 1358, 1364 (D.C. 1987). The court was clear, however, that, where the delay is due to "mere neglect," the equitable reasons for extending the option deadline are less convincing. Id. ("The case law further distinguishes between mere neglect on the part of the lessee, in which case equity will not grant relief, and an honest mistake, which often permits the intervention of equity." (citation and footnote omitted)). In this case, Equities does not allege that the option language in the Lease was ambiguous or that Commerce engaged in conduct that prevented Equities from giving timely written notice of its intent to exercise the option. Thus, these cases do not support equitable relief in this instance.

Nor is there evidence in the record from which Equities could reasonably infer that Colin intended to waive the written notice requirement. In Pennsylvania,

> [w]aiver is a voluntary and intentional abandonment or relinquishment of a known right. Waiver may be established by a party's express declaration or by a party's undisputed acts or language so inconsistent with a purpose to stand on the contract provisions as to leave no opportunity for a reasonable inference to the contrary.

Samuel J. Marranca Gen. Contracting Co., Inc. v. Amerimar Cherry Hill Assoc. Ltd. P'ship, 610 A.2d 499, 501 (Pa. Super. Ct. 1992) (citations omitted); Den–Tal–Ez, Inc. v. Siemens Capital Corp., 566 A.2d 1214, 1223 (Pa. Super. Ct. 1989) ("An implied waiver

8

exists when there is either an unexpressed intention to waive, which may be clearly inferred from the circumstances, or no such intention in fact to waive, but conduct which misleads one of the parties into a reasonable belief that a provision of the contract has been waived."). Ordinarily, the question of waiver is a question of fact for a jury. Hanover Const. Co. to Use of Ede v. Fehr, 139 A.2d 656, 658 (Pa. 1958).

In McClelland v. Rush, the Supreme Court of Pennsylvania held that the lessor had waived the written notice requirement in the lease by giving "express assent" to the lessee's oral notice of his intention to exercise his option to extend the lease. 24 A. 354, 355 (Pa. 1892). There was testimony from multiple witnesses that the lessee had clearly stated his intention to renew the lease, and the lessor had unequivocally accepted that verbal notice. Id. The conversations between lessee and lessor in McClelland were quite different than the conversations that Equities alleges took place here. Unlike in McClelland, Equities does not provide evidence that Commerce unequivocally accepted verbal notice of Equities's intention to exercise the option. Similarly, this case is distinguishable from Bantam Four Cinemas, Inc. v. Zamias, 544 A.2d 487 (Pa. Super. Ct. 1988). In that case, the plaintiff alleged that the lessor had orally accepted notice according to a practice established between the parties. Id. at 490. Here, Equities does not provide any evidence that Colin accepted oral notice or that there was any practice established by the parties for providing notice other than the written notice required by the Lease.

The District Court also correctly held that Commerce did not breach the covenant of good faith and fair dealing. "Pennsylvania courts impose a general duty of good faith

9

performance on each party in general commercial contracts." John B. Conomos, Inc. v. Sun Co., Inc., 831 A.2d 696, 706 (Pa. Super. Ct. 2003). "Good faith" has been defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing." 13 Pa. C.S.A. § 1201(b)(20). Examples of "bad faith" conduct include: "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." Kaplan v. Cablevision of PA, Inc., 671 A.2d 716, 722 (Pa. Super. Ct. 1996) (quotation marks omitted).

"The duty of good faith appl[ies] only in limited circumstances. Implied duties cannot trump the express provisions in the contract." John B. Conomos, Inc., 831 A.2d at 706. Here, the contract expressly required written notice and there is no evidence that Commerce acted to prevent Equities from giving that notice. Nor did Colin or Commerce have any duty to alert Equities to the written notice requirement. There is no "duty for commercial landlords to act as calendar clerks for their tenants." Brunswick, 864 A.2d at 399.[3]

For the foregoing reasons, we conclude that the District Court properly entered summary judgment in favor of Commerce on this issue.

B.

---

[3] Equities complains that it will suffer a significant loss due to its failure to renew the option, whereas Commerce suffered no harm from the late notice. However, it appears that Equities will not lose all of its investment in improving the land because the Lease provides that Commerce will pay Equities the fair market value for the improvements.

In its cross-appeal, Commerce maintains that the District Court erred in determining that "Improvements" as defined in the Lease includes the TD Bank building. Section 22(c) of the Lease provides that, at the expiration of the Lease, the lessee may either remove, abandon, or sell "the Improvements" to the lessor. JA B48. Commerce argues that the Lease distinguishes between improvements that existed on the Leased Premises at the time that the Lease was first executed in 1973, and improvements that were subsequently added to the Leased Premises. Commerce maintains that the improvements referred to in Section 22(c) do not include the TD Bank building because it was constructed after the Lease was executed.

We agree with the District Court that the improvements referred to in Section 22(c) include the TD Bank building. The Lease defines "Improvements" as "the buildings and improvements situated [on the Leased Premises]." Id. at B14. As the District Court observed, the Lease does not specify that the improvements be situated on the Leased Premises by a certain date. The paragraph relied upon by Commerce, which mentions both "other improvements" and "Improvements," provides that the lessee may "make alterations of and additions or other improvements to the Improvements or any part thereof." Id. at B28. It does not declare that the new improvements or additions do not thereafter fall under the definition of "Improvements" in the introduction to the Lease. Commerce's argument that the TD Bank building is a fixture and, therefore, owned by the owner of the land, is similarly unavailing. The Lease specifically states that the Improvements situated on the land are not included within the definition of the "Leased Premises." For these reasons, we agree with the District Court that Equities was

11

entitled to payment for the TD Bank building and the other improvements on the Leased Premises.

C.

Equities also challenges the District Court's holding that Equities had no right to remain in possession of the improvements while the parties negotiated a sale price and, as such, Equities's right to receive subrent from TD Bank terminated upon expiration of the Lease. Equities claims that it had a right to rent during the appraisal process. Commerce responds that the Lease required the appraisal process to occur within ten days after the expiration of the Lease, thus the Lease did not contemplate Equities being entitled to three years of accrued rents.

The Lease provides that, "[u]pon the expiration or sooner termination of this Lease, Lessee shall quit and surrender the Leased Premises to Lessor." JA B47. Because improvements are not included in the definition of "Leased Premises," the Lease does not expressly order the lessee to surrender the improvements upon the expiration of the Lease. Nonetheless, the District Court held that Equities did not have a right to remain in possession of the improvements during the appraisal period because the Lease does not contain any language "indicating that payment by Defendant is a condition precedent to Plaintiff's surrender of possession of the Improvements." Id. at A51.

We conclude that the District Court's ruling was correct. The Lease implies that possession of the improvements should be transferred to the lessor at the expiration of the Lease:

12

[A]t the expiration of the term hereof . . . Lessee may exercise any of the following options in connection with the Improvements: (i) To remove the Improvements from the Leased Premises; or (ii) abandon the Improvements; or (iii) to sell the Improvements to the Lessor at the then fair market value thereof.

Id. at B48. This language directs that the lessee's decision to remove, abandon, or sell the improvements must be made on the day the Lease expires. In fact, the Lease mandates that the sale negotiation process begin "at least thirty (30) days prior to the expiration of the term," presumably so that it may be concluded upon expiration of the Lease. The most logical reading of the Lease, therefore, is that the lessee must surrender possession of the improvements on the day the Lease expires, regardless of whether the appraisal process takes longer than anticipated. For that reason, we agree with the District Court that Equities was not entitled to subrent after December 31, 2009.

D.

Finally, Commerce contends that the District Court erred in holding that Abington retained its leasehold mortgage interest and its interest in the TD Bank building after expiration of the Lease until Commerce purchased the Improvements. Abington has not filed an appellate brief. Nonetheless, we must adjudicate the issue without the appellee's brief. Torisky v. Schweiker, 446 F.3d 438, 442 (3d Cir. 2006). Commerce cites no case law in support of its position.

We agree with the District Court that Abington retains a mortgage interest in the Improvements, including the TD Bank building, to the extent that Equities has an interest in the Improvements after the Lease expired. As security for its $2.4 million loan, Equities granted Abington, among other things, a first priority lien on all of Equities's

13

right, title, and interest in the Leased Premises and the Improvements thereon, and rents from the Leased Premises and Improvements. Equities's interest in the Leased Premises and the TD Bank building subrent expired on December 31, 2009. Thus, so did Abington's. See Bank of Nova Scotia v. St. Croix Drive-In Theatre, Inc., 728 F.2d 177, 182 (3d Cir. 1984) (commenting that the tenant "could mortgage no more than its interest"). We read the District Court's opinion as holding that Abington retained its leasehold mortgage interest after the Lease expired. Because we conclude that Equities, and therefore Abington, had no interest in the Lease after it expired, we will reverse the District Court on that point. We agree with the District Court, however, that Abington retained an interest in the proceeds from Equities's sale of the Improvements but did not retain any interest in the TD Bank building subrent.

IV.

We have considered the parties' remaining arguments and find them unpersuasive. In accordance with the foregoing, we will (a) affirm the District Court's grant of Commerce's motion for summary judgment with respect to Abington's and Equities's requests for a declaration that the Lease had not expired, (b) affirm the District Court's grant of Commerce's motion for summary judgment with respect to Abington's and Equities's requests for a declaration that they were entitled to subrent from the Improvements after expiration of the Lease, (c) reverse the District Court's grant of Abington's motion for summary judgment with respect to Abington's request for a declaration that it continues to hold a leasehold mortgage interest, and (d) affirm the District Court grant of Abington's motion for summary judgment with respect to

14

Abington's request for a declaration that it maintains an interest in the proceeds from the sale of the Improvements.